NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case: 2:15-cr-00193-SDW |
| v. | **OPINION** |
| WILLIAM E. BARONI, JR. and BRIDGET ANNE KELLY, | |
| Defendants. | December 16, 2015 |

**WIGENTON**, District Judge.

Before this Court is non-party Gibson, Dunn & Crutcher LLP's ("GDC") Motion to Quash William E. Baroni Jr. ("Baroni") and Bridget Anne Kelly's ("Kelly") (collectively, "Defendants") subpoena *duces tecum* pursuant to Federal Rule of Criminal Procedure 17(c).

For the reasons stated below, the Motion to Quash is **GRANTED**.

I. BACKGROUND AND PROCEDURAL HISTORY

This Court assumes familiarity with the allegations and procedural history of this case and reviews only the facts relevant to the present motion. In September 2013, local access lanes on the upper level of the George Washington Bridge were closed without public warning. (Dkt. No. 1, Indictment ¶¶ 4-5.) The closures were allegedly made at the direction of Defendant Baroni, who then served as the Deputy Executive Director of the Port Authority of New York and New

1

Jersey and Defendant Kelly, then the Deputy Chief of Staff for Legislative and Intergovernmental Affairs for the Office of the Governor of New Jersey ("OGNJ").  (*Id.* at ¶¶ 1.A, 1.B, 4-5.)

On January 9, 2014, the United States Attorney's Office for the District of New Jersey ("USAO") opened an investigation into the lane closures.  (Dkt. No. 16, May 27, 2015 Declaration of Michael Critchley ("May Critchley Decl.") Ex. 1.)  One week later, the OGNJ retained GDC to conduct a separate investigation into the closures, (Dkt. No. 28, Declaration of Alexander R. Southwell ("Southwell Decl.") Ex. D.; May Critchley Decl. Ex. 2 at 35)[1] and the New Jersey Legislature launched its own probe.[2]  GDC's investigative team included five former federal prosecutors with experience in internal investigations and criminal cases.  (Southwell Decl. Ex. C at 1; May Critchley Decl. Ex. 2 at 39-41.)  During its two-month investigation, GDC conducted over 70 interviews and reviewed more than 250,000 documents.  (Southwell Decl. Ex. C. at 1; May Critchley Decl. Ex. 2 at 36.)[3]  GDC summarized its findings in a report it publicly disclosed on March 27, 2014 ("Mastro Report").  (Southwell Decl. Ex. C.)  In addition to posting the report on a public website,[4] GDC provided the Mastro Report and seventy-five witness interview summaries to the USAO and the New Jersey Legislative Select Committee on Investigations. (Southwell Decl, Ex. C.)  Defendants were later indicted for their alleged roles in the lane closures.

---

[1] GDC was also asked to investigate allegations that officials attempted to coerce Hoboken Mayor Dawn Zimmer into advancing a real estate project in exchange for Superstorm Sandy recovery funds. (Memorandum of Law in Support of Non-Party Gibson Dunn's Motion to Quash Defendants' Subpoena *Duces Tecum* ("Mot. Quash") at 4.) Those allegations are not at issue here.

[2] The legislative probe was conducted by the New Jersey Legislative Select Committee on Investigation.  Reid J. Schar, *Interim Report to the New Jersey Legislature Regarding the September 23 2013 Closure of George Washington Bridge Access Lanes in Fort Lee* (Dec. 8, 2004),
http://www.njleg.state.nj.us/legislativepub/reports/interim_report.pdf.

[3] GDC did not, however, interview Defendants. (Mot. Quash 4.)

[4] The website, www.gdcreport.com is no longer available to view.  Visitors to the site receive a notification that "All access to this object has been disabled."

On May 27, 2015, Kelly filed, and Baroni joined, a Motion for Issuance of a Rule 17(c) Subpoena ("Mot. Subpoena") related to GDC's internal investigation for the OGNJ. (Dkt. No. 16.) Over the objection of GDC, this Court granted Defendants' motion by letter order on July 10, 2015. (Dkt. No. 24.) Defendants subsequently served a Rule 17(c) subpoena on GDC, seeking two categories of documents:

> a. Any and all handwritten or typed notes, stenographic transcripts and audio and/or video recordings of witness interviews conducted by Gibson Dunn during its representation of the Office of the Governor of New Jersey from on or about January 16, 2014 to the present.
>
> b. Any and all metadata and the document properties for all typed notes and interview summaries created during interviews of witnesses during Gibson Dunn's representation of the Office of the Governor of New Jersey from on or about January 16, 2014 to the present.

(Dkt. No. 16, Proposed Order.) Defendants also requested that "[i]n the event that any of the above information no longer exists, Gibson Dunn shall provide a written explanation to the Court of when the information was destroyed, why the information was destroyed, and at whose instruction the information was destroyed." (*Id.*) On August 21, 2015, GDC objected and responded to the subpoena and also filed the instant motion to quash. (Dkt. No. 28.) Kelly filed a brief in opposition on September 21, 2015, which Baroni joined. (Dkt. No. 35.) Baroni also filed a separate brief in opposition. (Dkt. No. 36.) GDC timely filed its reply on October 7, 2015. (Dkt. No. 38.)

## II.    LEGAL STANDARD

Federal Rule of Criminal Procedure 17(c) allows a party to issue a subpoena requiring a witness to produce "books, papers, documents, data, or other objects . . . before trial or before they are to be offered into evidence." FED. R. CRIM. P. 17(c)(1) (2015). Rule 17(c) is meant to provide the defense with an opportunity to inspect relevant and evidentiary materials before a hearing or trial, but is not "intended to provide an additional means of discovery." *Bowman Dairy Co. v.*

*United States*, 341 U.S. 214, 220 (1951); *United States v. Messercola*, 701 F. Supp. 482, 485 (D.N.J. 1988) (noting that the rule serves as a "convenient and time saving tool for trial preparation"). Because Rule 17(c) is not meant as a broad discovery device, a party seeking pretrial production and inspection of documents under Rule 17 "must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'" *United States v. Nixon*, 418 U.S. 683, 699-700 (1974). In short, the *Nixon* court stated, the party seeking the subpoena must demonstrate "(1) relevancy; (2) admissibility; and (3) specificity." *Nixon*, 418 U.S. at 700.

Rule 17 further provides that, upon motion, a court may quash or modify a subpoena "if compliance would be unreasonable or oppressive." FED. R. CRIM. P. 17(c)(2); *Nixon*, 418 U.S. at 698. The decision to enforce a subpoena is subject to the court's discretion. *Nixon*, 418 U.S. at 702 (noting that "[e]nforcement of a pretrial subpoena duces tecum must necessarily be committed to the sound discretion of the trial court since the necessity for the subpoena most often turns upon a determination of factual issues.")

### III. DISCUSSION

GDC's arguments to quash each of Defendants' two requests are considered in turn.

#### A. Notes, Transcripts and Recordings

In response to Defendants' request for notes, transcripts, and/or recordings "of witness interviews conducted by [GDC] during its representation of the [OGNJ]," GDC avers that "no notes, transcripts, and recordings of the witness interviews exist separate from the interview

4

memoranda that GDC released to the public and that GDC furnished . . . to Defendants." (Mot. Quash 1; *see also* Southwell Decl. ¶ 13, Ex. A.) Consequently, GDC argues that "the controversy between GDC and Defendants as to the first demand in the subpoena" is moot. (Mot. Quash 8.)

GDC was hired, at significant taxpayer expense, to conduct what was promised to be an open and "thorough" investigation.[5] (Dkt. No. 35, Sept. 21, 2015 Declaration of Michael Critchley ("Sept. Critchley Decl.") Ex. E at 36; Ex. G (quoting Governor Christie as promising that the investigation findings would be made "public without any restriction . . ..") GDC had "unfettered" access to over 70 individuals (May Critchley Decl. Ex. 2 at 36), and made the most of that access, using multiple attorneys to interview each witness, often multiple times. (May Critchley Decl. Exs. 7, 8 (detailing interview dates and attorneys present).) Attorneys are trained to scrupulously document information when conducting internal investigations, including taking and preserving contemporaneous notes of witness interviews.[6] In the past, GDC has done exactly that. Indeed, in 2013, the United States District Court for the Southern District of New York compelled GDC to produce interview notes that GDC took during its internal investigation of a limited

---

[5] Although the precise amount GDC has been paid is not clear from the motion papers, it appears that GDC has earned nearly eight million dollars for its representation of the OGNJ since January 2014. (May Critchley Decl. Ex. 5 (claiming the "legal tab for taxpayers topped $7.75 million"); *see also* www.project.wync.org/christie, (last visited Dec. 10, 2015).)

[6] GDC is a sophisticated and experienced law firm whose ranks include former prosecutors with knowledge and training in document preservation requirements in criminal matters. *See* http://www.gibsondunn.com/Search/Pages/EntireSiteSearch.aspx?k=(prosecutor) and http://www.gibsondunn.com/practices/pages/BCI.aspx, last visited Dec. 11, 2015 (identifying GDC hires with prosecutorial backgrounds). GDC's "Key Team Members" include: Randy Mastro ("one of the nations's leading litigators" and a former Assistant United States Attorney for the Southern District of New York); Debra Wong Yang (a veteran federal prosecutor and former judge); Alexander Southwell (a former Assistant United States Attorney for the Southern District of New York); Reed Brodsky (a former Assistant United States Attorney for the Southern District of New York who spent nine years with the office); and Avi Weitzman (a former Assistant United States Attorney for the Southern District of New York who spent seven years with the office). (May Critchley Decl. Ex. 2 at 39-41.)

partnership's financial dealings. *See Gruss v. Zwirn*, 296 F.R.D. 224 (S.D.N.Y. 2013) (rejecting GDC's work product and public policy objections to producing those materials). In *Gruss*, Jim Walden, the co-chair of GDC's White Collar Defense and Investigations group submitted a declaration to the court, describing the firm's "general practice" for internal investigations. (*Gruss v. Zwirn*, 09-CV-6441 (PGG) (MHD), Docket Entry 63 at 2.) In that declaration, he stated that he and others "trained associates concerning the relevant legal and factual issues, supervised them in the review of documents, reviewed interview outlines, and assigned them responsibility for taking hand written notes during witness interviews based on specific instructions premised on the partners' perspectives on relevance and probity." (*Id.*) Walden's declaration makes it clear that contemporaneous notes were taken by interviewers and that those notes were preserved after the summaries were completed. (*Id.* at 2-3.)

GDC acknowledges that it intentionally changed its approach in this investigation. (Dkt. No. 39, October 9, 2015 Letter from Randy Mastro (noting that GDC was "careful about the manner in which we prepared our interview memoranda and other work product" because of the parallel legislative investigation and media interest).) Pursuant to that new approach, "witness interviews were summarized electronically by one attorney while the interviews were being conducted and then edited electronically into a single, final version." (Southwell Decl. ¶ 13.) The practical effect of this unorthodox approach was to ensure that contemporaneous notes of the witness interviews and draft summaries would not be preserved. Rather, they would be overwritten during the creation of the revised and edited final summary.

It is easy to see why Defendants have cried foul. (Defs.' Brief in Opposition to Mot. Quash ("Defs.' Opp'n Br.") at 1 ("GDC claims that it billed New Jersey taxpayers nearly $10 million, but not a single lawyer took a single note during 75 interviews in the most high-profile political case

6

in recent years.").) This Court shares Defendants' frustration. Although GDC did not delete or shred documents, the process of overwriting their interview notes and drafts of the summaries had the same effect. This was a clever tactic, but when public investigations are involved, straightforward lawyering is superior to calculated strategy. The taxpayers of the State of New Jersey paid GDC millions of dollars to conduct a transparent and thorough investigation. What they got instead was opacity and gamesmanship.[7] They deserve better.

However, despite this Court's distaste for GDC's tactics, it has no basis to doubt the truth of GDC's representations, made by officers of the court under penalty of perjury, that additional materials responsive to Defendants' request, such as notes or drafts, do not exist. Therefore, this Court will grant GDC's motion to quash Defendants' request to produce this first category of materials.[8]

### B. Metadata

Defendants also request "[a]ny and all metadata and the document properties for all typed notes and interview summaries created during interviews of witnesses . . . from on or about January

---

[7] Defendants also argue that GDC's process violates its ethical obligations under the New Jersey Office of the Attorney General and Department of Law's Outside Counsel Guidelines which require outside counsel to "retain . . . work product . . . for a period of not less than seven (7) years from the date the matter is concluded or for the time period specified by rule or law in the jurisdiction in which the matter was pending, whichever is longer." (May Critchley Decl. Ex. 6 at 15.) This Court's ruling is limited to GDC's motion to quash; potential ethical violations of any retainer agreement between GDC and the OGNJ are in the purview of the State of New Jersey.

[8] Defendants' alternative argument that documents responsive to their first request should be produced pursuant to Federal Rule of Criminal Procedure 16(a)(1)(E) is unavailing. Rule 16(a)(1)(E) delineates the scope of the Government's disclosure and permits defendants to inspect or copy items material to their defense "if the item is within the government's possession, custody, or control." FED. R. CRIM. P. 16(a)(1)(E). This Rule does not apply to non-parties such as GDC. This Court could only extend the Rule's reach to a non-party if the government had "possession, custody or control" over the materials Defendants seek. *See, e.g.*, *United States v. Stein*, 488 F. Supp. 2d 350, 363-64 (S.D.N.Y. 2007) (requiring non-party to produce documents pursuant to Rule 16 where the non-party had entered into a deferred prosecution agreement with the government which gave the government the legal right to obtain documents held by the non-party). Here, the USAO did not (and does not) direct or control GDC's activities and does not have "possession, custody or control" of the materials Defendants seek. (Dkt. No. 38, Letter from Paul J. Fishman, Oct. 7, 2015 at 2-3.; Dkt. No. 39, Letter from Randy Mastro, Oct. 9, 2015 at 1.)

16, 2014 to the present." (Dkt. No. 16, Proposed Order.) To survive GDC's motion to quash, Defendants must show that the material they seek is relevant, admissible and specific as required by *Nixon*. 418 U.S. at 700.

Metadata is "electronically-stored evidence that describes the 'history, tracking, or management of an electronic document." *Aguilar v. Immigration & Customs Enf't Div.,* 255 F.R.D. 350, 354 (S.D.N.Y. 2008) (quoting *Williams v. Sprint/United Mgmt. Co.*, 230 F.R.D. 640, 646 (D. Kan. 2005)). Defendants seek the metadata from GDC's interview summaries in order to identify "who created the summaries, who if anyone edited the summaries, and when" in order to resolve potential future disputes at trial "as to the content of the summaries . . .." (Dkt. No. 16, Defs.' Mot. For Issuance of a Rule 17(c) Subpoena ("Mot. Subpoena") at 12.) GDC argues that the metadata Defendants seek is "patently irrelevant to the Government's case as charged in the Indictment against Defendants or any potential defense." [9] (Mot. Quash 9.)

Evidence is relevant under Federal Rule of Evidence 401 if it has "any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401 (2015). "In most cases . . . metadata [has] no evidentiary value – it does not matter when a document was printed, who typed the revisions, or what edits were made before the document was circulated." (Southwell Decl. Ex. F., *The Sedona Principles, Second Edition: Best Practices Recommendations and Principles for Addressing Electronic Document Production* cmt. 12a (Sedona Conference Working Group Series 2007).) Here, Defendants are charged with conspiring to misuse (18 U.S.C. § 371), and actually misusing, property of an organization receiving federal benefits (18 U.S.C. §§

---

[9] GDC does not claim that producing the metadata would be unduly burdensome. *Younes v. 7-Eleven, Inc.*, 2015 WL 1268313, at *4 (D.N.J. Mar. 18, 2015) (noting that "[g]enerally, the burden rests with the party objecting to the production of metadata or ESI to show undue hardship or expense.") Rather, it focuses its argument on Defendants' failure to satisfy the *Nixon* standard.

2, 666(a)(1)(A)); conspiring to commit (18 U.S.C. § 1349), and actually committing, wire fraud (18 U.S.C. §§ 2, 1343); conspiring to injure and oppress the civil rights of certain individuals (18 U.S.C. § 241); and acting under color of law to deprive those individuals of their civil rights. (Dkt. No. 1, Indictment.) Nothing in the tracking or management of GDC's witness summaries has any bearing on those offenses. Defendants were charged as a result of the USAO's sixteen-month investigation of the lane closures, not GDC's two-month probe. (*See* Dkt. No. 14, United States of America's Memorandum of Law in Support of Motion for Protective Order at 1.) The government investigation does not mention or refer to GDC's investigation or the firm's witness summaries. (*Id.* at 1-2 (describing the discovery materials the Government intends to make available to Defendants).) As such, Defendants have failed to show that the metadata they request is relevant or will lead to the discovery of admissible evidence.

Defendants explicitly claim that they require the metadata only to "identify which [GDC] attorney prepared the document in question in order to call the attorney as a witness" at trial, should a dispute arise as to the content of the summaries. (Dkt. No. 16, Mot. Subpoena at 12.) At best, the information Defendants would acquire would provide them with a means to impeach witnesses at trial. Rule 17(c), however, may not be used to obtain pretrial materials that are sought solely "for purposes of impeachment." *United States v. Cuthbertson*, 651 F.2d 189, 195 (3d Cir. 1981); *United States v. Onyenson*, No. 12-cr-602(CCC), 2013 WL 5322651, at *2 (D.N.J. Sept. 20, 2013) (recognizing that "it is clear that Rule 17(c) subpoenas may not be used to uncover materials sought solely for impeachment purposes"). If, as Defendants claim, there are discrepancies between what the witnesses said during their interviews and how their statements were memorialized in the GDC summaries, Defendants may call the witnesses and/or the GDC attorneys who conducted the

interviews to testify at trial.[10] Rule 17(c), as it relates to a third party, should only be enforced when Defendants cannot obtain the information sought from any other reasonable source. As both the witnesses and GDC attorneys are available to Defendants at trial, Defendants have no need for the summary metadata.

Because Defendants cannot show the information they seek is either relevant or admissible, this Court will grant GDC's motion to quash.[11]

### IV. CONCLUSION

For the reasons set forth above, non-party GDC's Motion to Quash is **GRANTED**. An appropriate order follows.

/s/ Susan D. Wigenton

SUSAN D. WIGENTON, U.S.D.J

Orig:    Clerk
cc:      Parties

---

[10] At this stage, Defendants have identified only two witnesses who take issue with GDC's summary of their interview statements and those discrepancies are seemingly minor. (Defs.' Opp'n Br. at 5-6; May Critchley Decl. Ex. 8, T:40-42, 51; Ex. 9, T:143, 222-224.) The need for the testimony of either the witnesses or the summaries' authors is speculative at this point. "The purpose of Rule 17(c) is to prevent trial delays" and there is no indication that denying Defendants access to metadata containing the identity of the authors of the GDC summaries would delay their trial. *United States v. Caruso*, 948 F. Supp. 382, 397 (D.N.J. 1996); *see also United States v. Brown, et al.*, 2015 WL 8375184 (D.N.J. Dec. 8, 2015) (denying defendants' motion for issuance of a Rule 17(c) subpoena where defendants failed to show that the trial would be delayed if they were denied the information sought.).

[11] Although it need not reach the issue, this Court finds little merit to GDC's argument that the material sought is protected by the work product doctrine. (Mot. Quash 16-19.) GDC has made the witness summaries available to the public, the USAO and the New Jersey Legislature. GDC has also freely spoken to the media about its findings and its final report. Having disseminated portions of its investigation so widely, its claim of privilege is tenuous. *See, e.g.*, *Gruss*, No. 09-cv-6441(PGG)(MHD), 2013 WL 3481350, at *11 (S.D.N.Y. July 10, 2013) (rejecting attorney client and work product protections for interview notes and interview summaries where GDC had disclosed portions of its internal investigation, including interview summaries to the SEC, finding that partial disclosure of that type was a manipulation of "evidentiary privileges to serve their interests").