**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| |
|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>WILLIAM E. BARONI, JR. and<br>BRIDGET ANNE KELLY |

Honorable Susan D. Wigenton,
United States District Judge

Crim. No. 15-193

---

**BRIEF IN SUPPORT OF MR. BARONI'S PRETRIAL MOTIONS**

---

On the brief:

Michael Baldassare, Esq.
Jennifer Mara, Esq.
Dillon Malar, Esq.

**BALDASSARE & MARA LLC**
570 Broad Street, Suite 900
Newark, New Jersey 07102
(973) 200-4066

*Attorneys for Defendant William E. Baroni, Jr.*

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................... 1

II.   THE INDICTMENT SHOULD BE DISMISSED BECAUSE IT WAS
      OBTAINED BY IMPROPERLY USING IMMUNIZED TESTIMONY. ...................... 5

      A.    Mr. Baroni Testifies Before the Legislative Committee ....................................... 5

      C.    The Indictment's Discussion of and Reliance Upon Mr. Baroni's
            Testimony ............................................................................ 6

      D.    Mr. Baroni's Testimony Before the Committee Should Not Have Been
            Presented to the Grand Jury in Obtaining the Indictment Against Him. .............. 7

III.  THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE
      INVESTIGATION AND PROSECUTION OF THIS CASE HAVE BEEN AND
      CONTINUE TO BE FUNDAMENTALLY UNFAIR. .................................................. 11

      A.    Introduction ........................................................................ 11

      B.    The Applicable Legal Standard ................................................. 12

      C.    The "Particular Situation" Of This Case And The Relevant Precedents ............ 13

            1.    Two presumptively innocent people are fending off three
                  behemoth entities with unlimited money and resources. ........................ 13

            2.    The prosecution turns a blind eye to Gibson Dunn's tactics. ................. 15

            3.    The prosecution withholds *Brady* information based on a side-
                  agreement with a private lawyer for an important person in this
                  case, never offers legal justification, and then argues "no harm, no
                  foul." ........................................................................ 21

            4.    The prosecution repeatedly tells Mr. Baroni, "Do it yourself." .............. 22

      D.    The Interests At Stake ............................................................ 24

      E.    Conclusion ......................................................................... 26

IV.   COUNTS ONE AND TWO OF THE INDICTMENT SHOULD BE DISMISSED
      FOR FAILURE TO ALLEGE A VIOLATION OF 18 U.S.C. § 666(A)(1)(A). ............ 27

      A.    Introduction ........................................................................ 27

      B.    The Statute and the Charges .................................................... 27

      C.    The Legislative History Of § 666 Demonstrates That The Statute Does
            Not Cover The Conduct Alleged In Counts One And Two. ............................... 28

      D.    The Case Law Demonstrates The Allegations In Counts One And Two
            Are Is Not Covered by § 666(a)(1)(A). ....................................... 31

            1.    Introduction ................................................................. 31

            2.    Courts Have Voiced Concerns About The Broad Language in
                  §666 ......................................................................... 31

3.      Section 666(a)(1)(A) "Obtain by Fraud" and "Knowingly
        Converts" Cases in This Circuit Are Inconsistent With The
        Allegations In This Indictment. .................................................. 33

4.      Section 666(a)(1)(A) "Obtains by Fraud" and "Knowingly
        Converts" Cases in Other Circuits Are Inconsistent With The
        Allegations In This Indictment. ................................................ 35

5.      Cases Relying on and Interpreting "Intentionally Misapplies"
        Subpart of § 666(a)(1)(A) Are Inconsistent the Allegations In This
        Indictment. ................................................................................. 41

6.      The Rule of Lenity ..................................................................... 45

E.      Conclusion ........................................................................................... 46

V.    COUNTS EIGHT AND NINE SHOULD BE DISMISSED FOR FAILURE TO
      ALLEGE A VIOLATION OF 18 U.S.C. §§ 241 AND 242. .......................................... 47

VI.   CONCLUSION ............................................................................................... 52

I.      **PRELIMINARY STATEMENT**

This prosecution is unprecedented in several respects.

First, contrary to well-established law, the U.S. Attorney's Office obtained the Indictment through the use of immunized testimony. Moreover, the Indictment explicitly relies upon that testimony. The law is clear. Whatever tortured legal theory the prosecution will offer in its own defense, the use of Mr. Baroni's testimony before the New Jersey Legislature was and is inappropriate. As discussed in Section II, the use of Mr. Baroni's immunized testimony warrants dismissal of the Indictment in its entirety.

Second, this investigation and prosecution have deprived Mr. Baroni of his rights under the Due Process Clause of the Fifth Amendment. The U.S. Attorney's Office has repeatedly failed to honor its mandate to deal with Mr. Baroni in a fundamentally fair manner. Indeed, the U.S. Attorney's Office has been manhandled by Gibson Dunn and the Port Authority. For example, despite the Court's Discovery Order requiring that Office to use "due diligence" to provide all potential *Brady* information, the prosecution failed to challenge invalid privilege assertions, inadequate logs and redactions that have no legal basis. That inaction is egregious because Gibson Dunn found "no evidence" that Mr. Baroni was involved in any alleged wrongdoing. GDC Rpt. at 2. Despite that finding, the prosecution did not think it important to get every document possible from Gibson Dunn.

The U.S. Attorney's "hands-off" policy is also inappropriate and fundamentally unfair because the same Gibson Dunn lawyers who withheld documents in this case simultaneously represent the Port Authority in a high-stakes multi-million dollar litigation regarding the recent toll and fare increase. That might not pose such a problem, except for the fact that – by the words of the U.S. Attorney's Office at its press conference – the Port Authority is part of the investigatory and prosecution team. Thus, the same lawyers that the U.S. Attorney's Office left alone simultaneously represent the very entity that stood shoulder to shoulder with the FBI and the U.S. Attorney's Office at the press conference, all congratulating and thanking each other.

This is not to explicitly allege a vast conspiracy of wrongdoing. Rather, it may explain the institutional inertia or group thinking that led the U.S. Attorney's Office to grant Gibson Dunn special permission to act as it saw fit when responding to grand jury subpoenas. That was, and as this case heads to trial remains, fundamentally unfair under the applicable legal standard.

The prosecution has also deprived Mr. Baroni of his due process rights based upon its open and intentional mishandling of *Brady* material. Despite this Court's Order to use "due diligence" to provide Mr. Baroni with all potentially favorable information by May 15, 2015, the U.S. Attorney's Office entered into a "constitutional pinky-swear" with the private attorney representing Port Authority Assistant General Counsel Philip Kwon. In sum, and as the Court knows, the prosecution promised not to tell Mr. Baroni or Ms. Kelly what *Brady* information Mr. Kwon had provided. The prosecution openly acknowledges that side deal as its basis for withholding the *Brady* material. Faced with a motion to compel, and with no legal support to defend its ridiculous position, the U.S. Attorney's Office asked Mr. Kwon's lawyer for permission and, thereafter, provided the information (eight months late, and without any explanation). Among other things, this disregard for the law demonstrates that more *Brady* will appear too late to provide Mr. Baroni with due process. The prosecution's mishandling of *Brady* material has rendered this prosecution fundamentally unfair.

Further, rather than take the high road and correct its errors or assist Mr. Baroni in fixing them – *i.e.*, act in a fundamentally fair manner – the prosecution's response has been in essence, "Do it yourself." Thus, when Mr. Baroni asked the U.S. Attorney's Office to request from Gibson Dunn documents it had withheld on facially invalid grounds as well as to request adequate privilege logs and unredacted documents, the response was, verbatim: "Rule 17 provides a vehicle for you to seek them. (You could also, of course, ask counsel for the [Office of the Governor of New Jersey] to voluntarily provide the material you want.)." When Mr. Baroni asked the U.S. Attorney's Office if it had ever even challenged the privilege assertions, the redactions or the inadequate privilege logs, the prosecution did not directly respond except for a generalized comment that it had "no obligation" take action. And, the prosecution told Mr.

Baroni to get the *Brady* information from Mr. Kwon's lawyer if he was willing to share it.  Given how the real world works (and as the U.S. Attorney's Office certainly knew) Mr. Kwon's lawyer refused to speak with Mr. Baroni's counsel.  There is no "do it yourself" exception to the Due Process Clause and the prosecution's actions here have rendered this prosecution fundamentally unfair.  All these Due Process Clause violations are discussed in Section III.

Third, Counts One and Two charge an offense that does not cover the allegations in this case, 18 U.S.C. § 666.  The legislative history and a thorough review of the case law in the Circuit and elsewhere lead to one inevitable conclusion: § 666 does not reach the conduct alleged in the Indictment.  Thus, even if everything happened as alleged (and it did not), there would be no crime under § 666.  The simple fact is that § 666 covers stealing money or property for the defendant's benefit and similar actions.  It does not criminalize political revenge in the form of traffic.  Thus, despite the fact that David Wildstein's allegations are false, the prosecutors have endorsed a tale that would not be a crime even if it had occurred.  As discussed in Section IV, Counts One and Two should be dismissed.

Fourth, Counts Eight and Nine should be dismissed because the allegations in this case do not fall within the narrow scope of 18 U.S.C. §§ 241, 242.  Those Counts are based on a novel and flawed legal theory, namely that citizens have a constitutional right to be traffic free in their own state.  Even though Counts Eight and Nine allege a violation of "the localized travel rights of the residents of Fort Lee," Ind. at 33, the Supreme Court has never recognized a constitutional right to *intra*state travel.  Moreover, the lower court cases that discuss and permit a limited right to travel intrastate do so under circumstances that have nothing to do with traffic.  *I.e.*, a ban, under penalty of fine, on driving in an area within a certain timeframe.  Ultimately, as the district court noted in *Lanin v. Borough of Tenafly*, 2:12-02725 KM MCA, 2014 WL 31350, at *9 (D.N.J. Jan. 2, 2014), "[t]raffic … is not a deprivation of a fundamental right.  Nor does it violate any fundamental right to require that auto traffic, at certain times of day, take a route that turns out to be more circuitous[.]"  As discussed in Section V, Counts Eight and Nine should be dismissed.

For all these reasons, the Court should dismiss the Indictment or, in the alternative, dismiss Counts One, Two, Eight and Nine.

## II.   THE INDICTMENT SHOULD BE DISMISSED BECAUSE IT WAS OBTAINED BY IMPROPERLY USING IMMUNIZED TESTIMONY.

### A.   Mr. Baroni Testifies Before the Legislative Committee

By letter dated November 20, 2013, Chairman John S. Wisniewski summoned Mr. Baroni to testify before the New Jersey State Assembly Transportation, Public Works, and Independent Authorities Committee (the "Committee") regarding the lane closures at the George Washington Bridge. Chairman Wisniewski's letter stated in part:

> As you know, on September 9, 2013 the Port Authority inexplicably and without prior notice reduced the three eastbound lanes to the George Washington Bridge to one lane. These closures resulted in delays to traveling public and, more importantly, to emergency service vehicles. The community of Fort Lee, New Jersey was engulfed in gridlock during the morning rush hour until the lanes were reopened on September 13th. I respectfully invite you to testify before the Assembly Transportation, Public Works and Independent Authorities Committee concerning these issues.

Chairman Wisniewski continued by cautioning Mr. Baroni: "Please be advised that failure to appear before the committee *will result in the issuance of subpoenas* to require personal appearance to testify before the committee on this matter." (emphasis added).

Heeding the Chairman's warning, on November 25, 2013, Mr. Baroni appeared before the Committee and testified regarding various issues relating to the closure of the lanes at the George Washington Bridge. He was accompanied by his counsel from the Port Authority, Philip Kwon, who sat at the back of the room. Mr. Baroni read a prepared statement, presented a photographic exhibit, and answered numerous questions posed by Committee members. In what appears to have been an oversight on the part of the Committee, Mr. Baroni was not sworn in at the hearing.

### B.   The Relevant Statute

The appearance of witnesses, such as Mr. Baroni, before the Committee to give testimony is governed by N.J.S.A. 52:13-3. That statute provides in pertinent part:

Witnesses summoned to appear before any committee authorized by this article or any other law to conduct an investigation or inquiry shall be entitled to receive the same fees and mileage as persons summoned to testify in the courts of the state.  All such witnesses may be sworn by any member of the committee conducting the investigation or inquiry; and all witnesses sworn before any such committee shall answer truly all questions put to them which the committee shall decide to be proper and pertinent to the investigation or inquiry; and any witness so sworn who shall swear falsely shall be guilty of perjury.  No such witness shall be excused from answering any such questions on the ground that to answer the same might or would incriminate him; but *no answers made by any witness to any such questions shall be used or admitted in evidence in any proceeding against such witness, except in a criminal prosecution against the witness for perjury in respect to his answers to such questions.*

Any witness who refuses to answer any questions decided by the committee to be proper and pertinent shall be guilty of a misdemeanor and any witness who, having been summoned to appear before any such committee, fails to appear in obedience to the summons or, appearing, refuses to be sworn shall be guilty of a misdemeanor.

N.J.S.A. 52:13-3 (emphasis added).

C.     **The Indictment's Discussion of and Reliance Upon Mr. Baroni's Testimony**

The Indictment discusses and relies upon Mr. Baroni's legislative testimony in setting forth both the "manner and means" and the "overt acts" of the conspiracy alleged in Count One. Specifically, the Indictment alleges that "with defendant Kelly's knowledge, defendant Baroni and Wildstein converted the draft of the false and misleading written statement [allegedly prepared previously for a Port Authority report] into defendant Baroni's prepared opening testimony."  The Indictment also alleges:

On November 25, 2013, defendant Baroni appeared before the Assembly Transportation Committee and, with the knowledge and agreement of defendant Kelly and Wildstein, provided false and misleading testimony about the lane and toll booth reductions. During his testimony, defendant Baroni knowingly and intentionally made the following misleading statements and false representations, among others:

6

A.  Communications between members of the PAPD and Wildstein triggered the lane and toll booth reductions.

B.  The lane and toll booth reductions were part of a one-week traffic study.

C.  The failure to communicate with Fort Lee and the Executive Director was simply the result of communication breakdowns at the Port Authority.

In particular, with respect to what he repeatedly insisted were communication breakdowns with Fort Lee, defendant Baroni did not admit that he intentionally maintained "radio silence" toward Mayor Sokolich, but instead testified falsely, "[t]he communication was flawed internally, the communication was flawed with our neighbors—no question.  And I'm—given the amount of time I've spent building a relationship with Mark Sokolich—hugely problematic, personally."

Finally, the Indictment includes the following as an alleged overt act committed in furtherance of the conspiracy alleged in Count One:

On November 25, 2013, defendant Baroni provided false and misleading testimony regarding the lane and toll booth reductions to the Assembly Transportation Committee.

In light of the foregoing, it is clear that the prosecution used Mr. Baroni's testimony in obtaining the Indictment against him.

### D.      Mr. Baroni's Testimony Before the Committee Should Not Have Been Presented to the Grand Jury in Obtaining the Indictment Against Him.

Pursuant to N.J.S.A. 52:13-3, the government was barred from using Mr. Baroni's legislative testimony in any proceeding against him, including the grand jury proceeding that resulted in the Indictment in this case.[1]  But the government ignored the immunity provided by the statute and relied extensively upon Mr. Baroni's testimony in obtaining the Indictment against him.  This alone is reason enough to dismiss the charges against Mr. Baroni.

The fact that Mr. Baroni was summoned by letter, rather than subpoena, and was inadvertently not sworn in as a witness does not alter this conclusion.  Indeed, nearly 60 years

---

[1] The immunity afforded by the statute in state proceedings also extends to federal proceedings.  *See Murphy v. Waterfront Comm'n of New York Harbor*, 84 S. Ct. 1594, 1609-10 (1964) (holding that witnesses who were immune from prosecution under state law could not be prosecuted under federal law on the basis of their testimony).

ago, the New Jersey Supreme Court made clear that the immunity provision of N.J.S.A. 52:13-3 should be interpreted liberally to satisfy its underlying purpose – to secure testimonial evidence that would not otherwise be had from a particular witness absent a bar against using the witness's answers in any proceeding against him or her.  *State v. Spindel*, 24 N.J. 395, 402-03 (1957) (defendant's testimony before legislative investigating committee could not be used in proof of criminal accusation against defendant and could not be considered in preliminary hearing on complaint charging criminal violation).

In *Spindel*, there was a dispute as to whether a subpoena was in force at the time the witness testified before the legislative committee and, thus, whether his testimony was immunized, with the State contending that the subpoena had expired and the witness believing that the subpoena compelled his attendance and response to questions.  The Court held that the witness was entitled to the immunity provided by N.J.S.A. 52:13-3, even if his assessment of the force of the subpoena was incorrect.  The *Spindel* Court explained:

> It would subvert the outstanding policy of the statute were we to hold that a summons good and sufficient in law and of subsisting authority at the time when the testimony is given is a precondition to the operation of the immunity clause.  A correct assessment of the witness' legal responsibility cannot be made determinative of the right, if the statutory purpose is to be effectuated.  <u>There is no discernible reason of policy for abstract legalism in evaluating the legislative expression.  The reason of the enactment prevails over the literal sense of terms.</u>

(emphasis added).  Accordingly, the Court concluded that the witness's testimony could not be used by the State in a criminal proceeding against the witness.

Applying the Court's reasoning in *Spindel* here, the fact that Mr. Baroni was summoned to the Committee hearing by letter threatening use of a subpoena, rather than a subpoena itself, should not deprive Mr. Baroni of the statute's immunity clause.  Nor should the Committee's oversight in failing to swear in Mr. Baroni undercut the operation of the immunity provision.  Rather, in order to effectuate the purpose of the statute, Mr. Baroni's testimony should be afforded the full protection of the immunity provision.

Courts have consistently held in other contexts that the immunity afforded to legislative testimony is not compromised by the absence of a subpoena or the fact that the testimony was not given under oath. *See, e.g.*, *Yip v. Pagano*, 606 F. Supp. 1566, 1571-72 (D.N.J. 1985) (holding that witness's remarks before congressional subcommittee were immune from defamation suit even though witness was not subpoenaed by the subcommittee and was not under oath); *DeSantis v. Employees Passaic County Welfare Association*, 237 N.J. Super. 550, 554-55 (App. Div. 1990) (holding that witnesses' statements at public hearing were immune from defamation action and that such "privilege attaches regardless of whether the material is solicited or subpoenaed and regardless of whether it is given under oath); *see also Bio/Basics Int'l Corp. v. Ortho Pharm. Corp.*, 545 F. Supp. 1106, 1115-16 (S.D.N.Y. 1982) (holding that witness who appeared before legislative committee to testify regarding test done by medical research organization was absolutely immune from lawsuit based on that testimony, where witness had not been subpoenaed to testify, but instead was requested by subcommittee, which had power to subpoena witnesses to appear before it); *N. Coast Cable L.P. v. Hanneman*, 98 Ohio App. 3d 434, 440 (1994) ("The fact that a witness has agreed to testify voluntarily instead of having to be compelled to do so by subpoena does not, in and of itself make his testimony any less significant or less deserving of the protection afforded by an absolute privilege."); *Jennings v. Cronin*, 256 Pa. Super. 398, 402 n.2 (1978) (holding that coroner who testified in front of legislative committee was absolutely privileged in defamation action and finding issue of whether he was under subpoena at time of his testimony irrelevant in its determination, noting that "[t]he desirability of having witnesses feel free to volunteer testimony is self-evident; the possibility of compelling them to testify merely makes the safeguard of immunity 'the more necessary'") (quoting Restatement (Second), Torts, § 588, comment A.).

Finally, the fact that Mr. Baroni did not assert his Fifth Amendment right against self-incrimination prior to testifying (and did not receive a distinct grant of immunity in exchange for his testimony) is of no moment. The immunity here is self-executing. *See State v. Vinegra*, 134

N.J. Super. 432, 439 (App. Div. 1975).  In *Vinegra*, the Appellate Division analyzed a similar statute, which at the time provided:

> If any public employee testifies before any court, grand jury or the State Commission of Investigation, such testimony and the evidence derived therefrom shall not be used against such public employee in a subsequent criminal proceeding under the laws of this State; provided that no such public employee shall be exempt from prosecution or punishment for perjury committed while so testifying.

*Id.* at 440 (quoting N.J.S.A. 2A:81-17.2a2).  The court found that according to the plain language of the statute, the immunity was self-executing and "require[d] no assertion of privilege by the witness and no confirmatory action by the court or by the State."  *Id.*; *see also New Jersey v. Portash*, 440 U.S. 450, 461 n.1 (1979) (Brennan and Marshall, concurring).

In light of the foregoing, it is clear that the Indictment against Mr. Baroni should be dismissed because the government used Mr. Baroni's legislative testimony against him in violation of N.J.S.A. 52:13-3.

## III. THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE INVESTIGATION AND PROSECUTION OF THIS CASE HAVE BEEN AND CONTINUE TO BE FUNDAMENTALLY UNFAIR.

### A. Introduction

The Indictment should be dismissed because the investigation and prosecution of this matter have been and continue to be fundamentally unfair. *United States v. Marion*, 404 U.S. 307, 324 (1971) (noting that dismissal of an indictment is warranted based upon the Due Process Clause if it becomes apparent during trial that the defendant's right to a fair trial has been substantially prejudiced). As discussed in the following Sections, *Lassiter v. Dept. of Social Serv's*, 452 U.S. 18 (1981), sets forth the legal standard. In sum, *Lassiter* acknowledges that the Due Process Clause is not a fixed legal principle and can accommodate many situations. Ultimately, a district court must evaluate the "particular situation" of each case in light of "relevant precedents" and the "interests at stake." *Id.* at 25.

Application of *Lassiter* to the manner in which Mr. Baroni has been investigated and prosecuted exposes a process that has been and continues to be fundamentally unfair. The "particular situation" of this case requires Mr. Baroni and Ms. Kelly, private citizens with limited resources, to defend against three behemoths with unlimited resources and a never-ending supply of taxpayer money: the U.S. Attorney's Office, Gibson Dunn, and the Port Authority. That alone requires particular scrutiny of the integrity and fairness of this prosecution. And, as discussed in the following Sections, the "particular situation" here warrants review and the remedy of dismissal for additional three reasons: (1) the prosecution failed to even try to obtain documents from Gibson Dunn; (2) the prosecution withheld Brady information; and (3) the prosecution told Mr. Baroni to fix its own errors himself.

As for the final two inquiries, the "relevant precedents" are clear. The prosecution is not permitted to shrug at Gibson Dunn's bogus privilege assertions, unsupported redactions and logs that are insufficient as a matter of law. Aside from clear precedent, and even more to the point in this case, this Court's Discovery Order directed the U.S. Attorney's Office to produce (by May

11

15 of last year) all Brady material "which is known or that by the exercise of due diligence may become known to the attorney for the United States[.]"  Doc. No. 5 at 1-2.  Obviously, that did not happen.  Nor are prosecutors permitted to withhold *Brady* material based upon a side-agreement with a private lawyer for an interested party.  Nor may the prosecution shift its obligations to a defendant.  The interests at stake include Mr. Baroni's liberty, the public's interest in a fair trial, and the criminal justice system, which "suffers when any accused is treated unfairly."  *Brady v. Maryland*, 373 U.S. 83, 88 (1963).

For all these reasons, and as discussed in the following Sections, this has been a fundamentally flawed and unfair prosecution.  The Indictment should be dismissed.

### B.    The Applicable Legal Standard

The Fifth Amendment to the United States Constitution guarantees that "No person shall be … deprived of life, liberty, or property, without due process of law."  The Due Process Clause is not fixed legal concept.  Rather, the "process" to which a criminal defendant is "due" depends upon the situation in which the controversy arises.  As the Supreme Court stated in *Lassiter v. Dept. of Social Services,* 452 U.S. 18 (1981):

> For all its consequence, "due process" has never been, and perhaps can never be, precisely defined. "[U]nlike some legal rules," this Court has said, due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S. Ct. 1743, 1748, 6 L.Ed.2d 1230. Rather, the phrase expresses the requirement of "fundamental fairness," a requirement whose meaning can be as opaque as its importance is lofty.  Applying the Due Process Clause is therefore an uncertain enterprise which must discover what "fundamental fairness" consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake.

*Id.* at 25.  *See also Morrissey v. Brewer,* 408 U.S. 471, 481 (1972) (stating that due process is "flexible and calls for such procedural protections as the particular situation demands"); *Marincas v. Lewis,* 92 F.3d 195, 203 (3d Cir. 1996) (noting that "[p]recisely what minimum

procedures are due under a statutory right depends on the circumstances of the particular situation"). Thus, the Due Process Clause is broadly interpreted to meet the situation at hand.

### C.     The "Particular Situation" Of This Case And The Relevant Precedents

1.     Two presumptively innocent people are fending off three behemoth entities with unlimited money and resources.

The particular situation of this case sees two private citizens fending off three behemoths with unlimited money and resources:  the U.S. Attorney's Office (funded by taxpayers); Gibson Dunn (funded by taxpayers); and the Port Authority (funded by toll-payers and taxpayers). When they combine – as they have in this case – the "particular situation" indeed calls for exacting scrutiny to ensure that Mr. Baroni receives the full protection of the Due Process Clause.

As the Court knows, the U.S. Attorney's Office has at its disposal the grand jury, FBI agents, a legion of federal prosecutors, and broad subpoena power.  In this case, the U.S. Attorney used its power to prevent some people from testifying before the New Jersey Legislature committee investigating this matter, while permitting others to testify.[2]  The U.S. Attorney's Office also employed – as part of the "investigative team" – the personnel, financial and investigatory resources of Port Authority Office of the Inspector General.

Then there is Gibson Dunn, the global 1,200 lawyer firm, which has to date made nearly $10,000,000 off the New Jersey taxpayers, only engage in "opacity and gamesmanship" that was tantamount to shredded or deleting documents.[3]  Even before the charges were filed, taxpayer-funded Gibson Dunn took steps to ensure Mr. Baroni did not have access to the basis for its conclusion, among other things, that there was "no evidence" that Mr. Baroni was involved in closing the lanes for a retaliatory purpose as alleged in the Indictment, *i.e.*, the *Brady* material upon which that conclusion is based.  That is why, for example and as detailed throughout this submission, when responding to grand jury subpoenas, Gibson Dunn withheld critical documents

---

[2] www.wsj.com/articles/u-s-attorney-tells-n-j-legislature-to-not-talk-to-bridge-scandal-witnesses-1405463965.

[3] *See* Court's December 16, 2015 Opinion on Gibson Dunn's motion to quash at 6-7 (Doc. No. 52).

based upon privilege assertions that do not even – to put it colloquially – "pass the red face test." For instance, Gibson Dunn withheld:

- emails and documents *from the week of the lane closures* without providing the U.S. Attorney's Office with sufficient information upon which it could determine whether the privilege was properly asserted

- emails and documents *from the week of the lane closures* between David Wildstein (PA employee/non-lawyer) and Michael Drewniak (Press Secretary for the Governor/non-lawyer) on the basis of attorney-client privilege, even though it is clear that no such privilege could possible exist between those individuals, non-lawyers at autonomous entities.

- emails *from the week of the lane closures* between Wildstein (PA employee) and Nicole Crifo (Senior Counsel to the Governor in the Authorities Unit).

As discussed, *infra*, the U.S. Attorney's Office did not think any of those documents were worth getting.  Nor, as noted in Mr. Baroni's Reply Brief on the discovery motions, did the U.S. Attorney's Office press Gibson Dunn on material obtained from the personal phones provided by the Governor and his senior staff.

Lastly, there is the Port Authority, a bi-state agency with a budget larger than 11 states, funded by commuters and taxpayers.[4]  According to the Indictment, the PA is the alleged victim regarding the funds necessary to establish the jurisdictional element of the § 666 charge in Counts One and Two.  Of course, and not surprisingly given this unorthodox prosecution, the alleged victim was allowed to be part of the prosecution team.

Not content with the dual role of alleged victim/prosecution team member, the PA is now *a litigant in this case*, having sought to withhold even more documents.  *See* Doc. No. 47.  The PA is represented by a large law firm (paid for by commuters/taxpayers).   The alleged

---

[4] www.usatoday.com/story/news/nation/2014/04/07/new-york-new-jersey-port-authority-money-machine/7423323/.

victim/prosecutor team member/litigant PA has used its vast sums of money to pay lawyers for many people (some of whom, presumably, will be witnesses for the prosecution); the names of those people are a secret, known only to the PA and the State.[5]

The "particular situation" that demands dismissal pursuant to the Due Process Clause is not only embodied within the three unlimited money and resource entities that have teamed up against Mr. Baroni.  As discussed in the following Sections, the need for judicial intervention on principles of fundamental unfairness flows from what these behemoths have done and, in some instances, *not* done.

2.   <u>The prosecution turns a blind eye to Gibson Dunn's tactics.</u>

Mr. Baroni and Ms. Kelly have already alerted the Court to some of what the U.S. Attorney's Office has known for well over one year.  As detailed in Mr. Baroni's brief in support of his discovery motions, the U.S. Attorney's Office knows and has known the following <u>undisputed</u> facts, all of which are documented in this case.  The prosecution never tried to get the documents.  Given the fact-specific inquiry envisioned by *Lassiter*, and this Court's Order that the U.S. Attorney's Office use "due diligence" to obtain *Brady* material, the failure to do so is all the more obvious and problematic.

"Due diligence" is defined as:

> Such a measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances; not measured by any absolute standard, but depending on the relative facts of the special case.  *Black's Law Dictionary,* 411 (5th ed.1979).  *See also Beauty Time, Inc. v. Vu Skin Sys., Inc.,* 118 F.3d 140, 144 (3d Cir.1997) (quoting *Black's Law Dictionary* in defining "reasonable diligence" as " 'A fair, proper and due degree of care and acting, measured with reference to the particular circumstances; such diligence, care, or attention as might be expected from a man of ordinary prudence and activity." ').

*Fontaine v. Hess Oil Virgin Islands Corp.*, 2000 WL 1141065, at *2 (June 2, 2000 Terr. V.I.).  As discussed throughout this submission, and in Mr. Baroni's brief in support of his motion to

---

[5] www.northjersey.com/mobile/news/names-sought-on-gwb-scandal-related-legal-bills-1.1498955.

compel discovery, the U.S. Attorney's Office has failed to even approach an exercise of due diligence.

For example, every single sentence in the following bullet points are documented and undisputed:

- Gibson Dunn refused to produce 2,381 documents, asserting the "Deliberative Process Privilege."  Gibson Dunn asserted that privilege when it does not – as a matter of law – apply, such as over a campaign documents.  (Bates numbers OGNJ-USAO-088665 to OGNJ-USAO-088674; OGNJ-USAO-088675 to OGNJ-USAO-088677; OGNJ-USAO-088678 to OGNJ-USAO-088680).  Even armed with all that knowledge, the prosecution took no steps to challenge Gibson Dunn's reliance upon the DPP to withhold 2,381 documents.

- Gibson Dunn redacted 709 documents, usually claiming the information is personal and confidential.  It is black-letter law that is not a legal basis upon which information may be withheld in response to a grand jury subpoena.  Further, the government knew (by comparing Gibson Dunn's complete redaction of the Governor's schedule from a critical week to an unredacted copy produced by another subpoena recipient) that Gibson Dunn's redactions are wholly inappropriate and, in fact, attempted to conceal at least one relevant matter.

- Gibson Dunn has not produced material from the cellphones of the Governor and his high-level staff, notwithstanding that its possession of those materials has been made public several times.  The government has done nothing about it, even though the other discovery in this case demonstrates that a good deal of the State's executive branch operated via text messages.  Mr. Baroni believes that the time has passed for that information to be available to him via subpoena.

- Gibson Dunn produced hundreds of thousands (if not one million) pages of discovery in a near-useless format.  That has been detailed in Mr. Baroni and Ms.

16

Kelly's briefs.  Any private party responding to a federal grand jury subpoena in this district would have seen the production returned with a post-it note saying, "Try again."  Here, the U.S. Attorney's Office shrugged and, when questioned about whether it had ever challenged the format, told Mr. Baroni he received "the material (in whatever form) that we received it from" Gibson Dunn, as if that were an excuse.  *See* X-COURT_42.

- Gibson Dunn reached the conclusion that there was "no evidence" that Mr. Baroni was involved in the traffic study being used for retaliation.  In other words, based upon the fruits of its investigation (no notes/withheld documents), Gibson Dunn concluded Mr. Baroni is innocent of these charges.  The U.S. Attorney's Office has done nothing to obtain the documents.

Despite this knowledge, the U.S. Attorney's Office did nothing.  Indeed, according to the prosecution, they are not required to do anything about it.  Turing a blind eye to this significant information, the prosecution argues, is fine.  Fundamental fairness suffers not, they argue.

When viewed in light of the relevant precedents, *Lassiter*, 452 U.S. at 25, the prosecution's inaction was and is fundamentally unfair.  The Third Circuit case *United States v. Perdomo*, 929 F.2d 967 (3d Cir. 1991), demonstrates why the prosecution's inaction violated the Due Process Clause.  The Court vacated and remanded a defendant's conviction because the government failed to affirmatively seek certain information within its grasp.  *Id.* at 968-71.[6]  This case involved a drug prosecution in the District of the Virgin Islands.  *Id.* at 968.  The government told the defense that the main witness, Hector Soto, had no criminal record.  *Id.*  The day after the verdict, it was discovered that Soto did, in fact, have a criminal record within that District.  *Id.* at 969.  The defendant filed a motion for a judgment of acquittal or a new trial.  *Id.*  At a hearing, the prosecution defended itself by arguing that an NCIC search did not turn up a criminal history for Soto.  *Id.*

---

[6] The Court remanded the matter for the entry of a judgment of acquittal or a new trial.  *Perdomo*, 929 F.2d at 968.

The district court found that the government "had not suppressed" the criminal record and "that the prosecution's failure to learn of the record could not 'in any way [be] determined [a] material suppression of exculpatory evidence.'"  *Id.* at 969 (alterations in original).  The district court also "charged the Office of the Public Defender with knowledge of Soto's criminal record because that office had represented Soto in a prior criminal proceeding."  *Id.*  Thus, the district court concluded there was no *Brady* violation and denied the defendant's motion.

However, the Third Circuit reversed and remanded for a new trial or the entry of a judgment of acquittal.  The Court observed that it is "well accepted that a prosecutor's lack of knowledge does not render information unknown for *Brady* purposes."  *Id.* at 970.  The Court endorsed the Fifth Circuit's approach in *United States v. Auten*, 632 F.2d 478 (5th 1980), in declining "to excuse non-disclosure in instances where the prosecution has not sought out information readily available to it."  *Perdomo*, 929 F.2d at 970 (citing *Auten*).  The Court reasoned that "*Auten* also stands for the proposition that non-disclosure is inexcusable where the prosecution has not sought out information readily available to it."  *Id.* at 971.  The Court held that

> the prosecutor's argument that he did not have any knowledge of Hector Soto's criminal history is without merit. The prosecutor was obliged to produce information regarding Soto's background because such information was available to him.  In view of the fact that local Virgin Islands arrests and convictions are not recorded in the NCIC database, (see Perdomo Br. at 10) it is apparent to this court that the computer search was merely **a token effort**.  Such an ineffectual attempt to verify a key prosecution witness' criminal history amounted to conduct unworthy of the United States Attorney's Office.

*Id.* at 970-71 (emphasis added).

In the circumstances of *Perdomo*, the Court's decision focused on the issue of whether an arm of the government had the information.  *Id.* at 971.  Here, some documents are in the possession of the U.S. Attorney's Office's investigative partner, the Port Authority.  As for the documents in the possession of Gibson Dunn, that entity is a *de facto* part of the government given that it has been publicly funded and has largely waived privilege by producing the

interview memoranda.  Under *Lassiter*, and difference between the entities in that case and the PA and Gibson Dunn are of little consequence, nothing more than nuance.

Indeed, *Perdomo* and this case share far more similarities than differences.  In *Perdomo*, the Third Circuit rejected the district court's decision to charge the public defender's office with knowledge of Soto's criminal history because that office had represented him previously.  The district court's position, rejected by the Third Circuit, is akin to the government's "do it yourself" arguments throughout this case.  *Perdomo* makes clear that the government cannot – and a district court should not – shift *Brady* obligations to the defense.

In *Pedromo*, the government was called to account for failing to produce *Brady* material about which it did not know.  Here, the prosecution *knew* the documents existed.  The prosecution *knew* whom to contact and where to find them.  The prosecution *knew* the documents involved people critical to the charges against Mr. Baroni.  The prosecution *knew* the documents involved time periods upon with the Indictment is based.  The prosecution *knew* the documents were being withheld on spurious grounds.  The prosecution *knew* the privilege/redaction logs did not provide enough information upon which *Brady* obligations could be discharged.  The prosecution *knew* Gibson Dunn has taken untenable positions and that the interviews had been conducted with a "calculated strategy" of "gamesmanship" and distasteful "tactics."[7]  Despite all this, the prosecution engaged in no due diligence.  If, as the Third Circuit has held, the prosecution  must be called to account for making only "a token effort" to find material it did not even know existed, the inaction here is far more problematic, far more deserving of a remedy, and far more fundamental fairness.

Further, under the facts of this case, *Lassiter*, 452 U.S. at 25, the U.S. Attorney's Office is charged with constructive possession of some or all of the withheld documents because it is crystal clear that the government would have prevailed on a motion to compel.  The Office's ability to compel the production of documents pursuant to a grand jury subpoena is powerful and

---

[7] Court's December 16, 2015 Opinion at 7.

broad.  Indeed, it is difficult to imagine how the government could have *lost* a motion to compel filed pursuant to the Court's Order for it to use "due diligence" to obtain the documents.

Consistent with *Lassiter*'s instruction to consider "relevant precedents," the decision in *United States v. Auten*, 632 F.2d 478 (5th Cir. 1980), should also guide the Court's analysis.  In *Auten*, the prosecution decided the night before trial to call Michael Roy Taylor as a witness.  *Id.* at 480.  The prosecution did not run an NCIC criminal history check.  *Id.*  It was discovered that Taylor had a criminal history and that, therefore, the defendant had been denied *Giglio* material with which he could have impeached Taylor's credibility.  The Fifth Circuit concluded that the defendant's *Brady* claim "has merit and compels closer scrutiny."  *Id.* at 480.

In reaching its decision to remand for an evidentiary hearing, the court observed certain legal principles relevant to Mr. Baroni's motion.  The court concluded that shortness of time (the government's decision to call Taylor the night before trial) did "not change 'known' information into 'unknown' information within the disclosure requirement."  *Id.* at 481.  The court stated that the

> basic import of *Brady* is ... that there is an obligation on the part of the prosecution to produce certain evidence actually or constructively in its possession **or accessible to it** in the interests of inherent fairness.

*Id.* at 481 (quoting *Calley v. Callaway*, 519 F.2d 184, 223 (5th Cir. 1975)) (alterations in original) (emphasis added).

*Auten* is important to Mr. Baroni's motion for several reasons.  Here, the U.S. Attorney's Office has had knowledge of the withheld documents, redactions and insufficient logs for many months and in all likelihood over one year.  If the failure to act in the heat of trial is inexcusable, the government's inaction here renders these proceedings fundamentally unfair.  In fact, the circumstances of this case are worse because the prosecution has long known that Gibson Dunn's conclusion was that Mr. Baroni is innocent of the charges.  The prosecution has also known the high-ranking members of the PA concluded that Mr. Baroni's testimony before the New Jersey Legislature was true in material respects.  *See* Def.'s Disc. Br. at 37, 41-42.

20

3.   The prosecution withholds *Brady* information based on a side-agreement with a private lawyer for an important person in this case, never offers legal justification, and then argues "no harm, no foul."

As the Court may recall, the prosecution withheld Brady information received from Philip Kwon, a key player in this matter, for eight months based upon a side agreement with Mr. Kwon's private lawyer.  Fundamental fairness requires this Court to call the U.S. Attorney's Office to account for its actions.[8]  The prosecution believes there is a "no harm, no foul" to intentionally withholding *Brady* material without justification.  The prosecution has the gall to tell this Court that Mr. Baroni's motion regarding the Kwon *Brady* material is moot.  It is not. Moreover, the prosecution believes it can gain a significant advantage by withholding *Brady* material for eight months then – when faced with a motion to compel and no cases to cite in its own defense – the prosecution produces significant *Brady* material that Mr. Baroni could have used for the past eight months while attempting to analyze the massive discovery, interviewing witnesses, and preparing for trial in every other respect.

It is not as if the Kwon *Brady* material is insignificant or inconsequential.  That information deals directly with the timeframe charged in Counts One through Seven, the prosecution's theory of the case for all the Counts, as well as numerous key players in the prosecution's allegations.

The "relevant precedents," *Lassiter*, 452 U.S. at 25, demonstrate that this prosecution has violated the "lofty," *id.*, protections guaranteed by the Due Process Clause.  The Court does not need detailed  exposition regarding the prosecution's *Brady* obligations.  Mr. Baroni has already stated his position on that topic in his Brief in support of the discovery motions.  Suffice it to say that the prosecution's promise to Mr. Kwon's lawyer is absurd.  That is – or should be to the prosecution – so painfully obvious it nearly defies explanation.  Once again for the prosecution's benefit, the Court's Discovery Order compelled production of *Brady* material by May 15, 2015.

---

[8] Pursuant to the Court's Discovery Order, Doc. No. 5, Brady material was due by May 15, 2015.  The prosecution did not produce the Kwon *Brady* material until January 11, 2016, Doc. No. 62, and only then because it could no longer defend its absurd position.

And, of course, there are the well-settled *Brady* obligations imposed upon prosecutors discussed herein as well as Mr. Baroni's Brief in Support of his Discovery Motions.

Despite the Court's Order, the clear legal obligations, the inability to defend its actions, and the significance of the Kwon *Brady* material, the prosecution still refuses to even acknowledge it is *Brady* material.  This begs an inquiry of what else the prosecution has that it has deemed unworthy of such caution.  The prosecution states that Mr. Baroni and Ms. Kelly "cannot enlist the Government to do what they can do themselves – issue to the OGNJ a subpoena for additional information."  Gov't Opp'n Br. on Discovery Motions at 3 (Doc. No. 45).  The prosecution does not understand its *Brady* obligations.  Permitting Bill Baroni and Bridget Kelly's prosecution to continue in light of all this is fundamentally unfair, particularly because their *Brady* rights flow from the Due Process Clause.  *United States v. Bagley*, 437 U.S. 667, 675 (1985).

> 4.    The prosecution repeatedly tells Mr. Baroni, "Do it yourself."

This Court's Discovery Order and the relevant precedents demonstrate that the prosecution's decision to tell Mr. Baroni, "Do it yourself," renders this prosecution fundamentally unfair.  On May 4, 2015, this Court ordered the U.S. Attorney's Office to, within 10 days, produce Brady material <u>"which is known or that by the exercise of due diligence may become known to the attorney for the United States[.]"</u>  Doc. No. 5 at 1-2.  On numerous occasions, upon receipt of an appropriate request (all of which would have furthered the fundamental fairness of this prosecution), the U.S. Attorney's "due diligence" response has been, in essence, "Do it yourself."

Mr. Baroni requested assistance from the U.S. Attorney's Office in obtaining documents (whether by motion or an informal request) inappropriately withheld or redacted by Gibson Dunn, as well as logs with sufficient information.  D12-17 (attached to Mr. Baroni's Brief in support of his discovery motions).  The prosecution declined, telling Mr. Baroni to use Rule 17 (which requires leave of Court and is, in the real world, not greeted with the same gravitas as

contact from federal prosecutors), or to call Gibson Dunn.  X-COURT_42.[9]  That is not how the law works.  The information was "accessible" to the prosecution, *Auten*, 632 F.2d at 481, and given the Court's Order to use "due diligence" to find and produce *Brady* material, the failure to even try to obtain the information from Gibson Dunn and PA is inexcusable.  In this case, "due diligence" to know that Gibson Dunn had potential Brady information required nothing more than reading the privilege logs and knowing that the firm had concluded there was "no evidence" that Mr. Baroni was involved in any alleged retaliatory motive.

The prosecution took a similar position regarding the inappropriately withheld Kwon *Brady* information.  Rather than just produce the information, the U.S. Attorney's Office tried a game of cat and mouse during which it informed Mr. Baroni he should call Mr. Kwon's attorney for the information.  The prosecution knew, based on experience and, once again, how this world works, that Mr. Kwon's lawyer would decline to even comment on that information.  And, as the Court knows, that is precisely what happened.  Thankfully, when faced with nowhere to turn, no support from the law and – stunningly – only after Mr. Kwon's lawyer granted the Office permission to meet its *Brady* obligations, Doc. No. 62, the information was disclosed.

The "do it yourself" answer might be appropriate when two equally matched adversaries are fighting over money, where both parties have the same ability to obtain discovery from each other, and where neither party is constitutionally obligated to ensure fairness.  Such a response is inappropriate in this, or any, criminal prosecution.  The Due Process Clause guarantees Mr. Baroni a fair trial.  The U.S. Attorney's Office has an obligation to take every step possible to vindicate and ensure that right.   Indeed, federal prosecutors are the "final arbiters of the government's obligation to ensure fair trials."  *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).

---

[9] If the U.S. Attorney's Office truly believed Mr. Baroni could obtain the necessary documents via Rule 17 it should, by any sense of fair play, provide him with the subpoena(s) served upon Gibson Dunn.  The prosecution has declined to do so and has opposed Mr. Baroni's motion – pending before the Court – to compel production of that document.

### D.     The Interests At Stake

The interests at stake, *Lassiter*, 452 U.S. at 25, have largely been discussed in the preceding Sections.  Bill Baroni's freedom is on the line.  He is defending serious federal charges.  At this point in the proceedings, Mr. Baroni's primary interest focuses on receiving fundamentally fair treatment from the prosecutors so that he can meet the allegations and clear his name.  Thus, the interests at stake for Mr. Baroni are of the highest order, far more significant that, for example, an individual's interest in continued employment.  *See Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 574 F.3d 214, 220 (3d Cir. 2009).

The U.S. Attorney's Office has besmirched his name on national television during a lengthy press conference at which, rather than simply review the charges, the prosecution editorialized with an introductory tale, stating that Mr. Baroni "callously victimized the people of Fort Lee[.]"  Doc. 19 at 2.  Mr. Baroni, a well-respected lawyer and adjunct professor of law, cannot work in his chosen profession because of the allegations.  He has limited resources and, other than friends, family and his lawyers, stands alone before the U.S. Attorney's Office, Gibson Dunn, and the Port Authority.  As noted, *supra*, the prosecution's argument that Mr. Baroni has the same power to compel documents and demand information as the U.S. Attorney's Office is just not credible.  David met one Goliath; Bill Baroni faces three.  Mr. Baroni's liberty interest is sacrosanct and deserves the highest protection.

The U.S. Attorney's Office is interested in prosecuting allegations of federal crime and in providing Mr. Baroni with a fair trial.  That Office has embraced the former with zeal; it has failed on the latter.  The prosecution has no interest in protecting Gibson Dunn or saving the firm the work of doing things right.  The prosecution has no interest in permitting Gibson Dunn to hide documents based upon obviously invalid privilege assertions, redactions and logs.  It is truly unprecedented to see a law firm manhandle the U.S. Attorney's Office in the manner that has occurred in this case.  Respectfully, the prosecution should have investigated this matter in a fundamentally fair manner.  That did not happen.

Under the law, Mr. Baroni and the U.S. Attorney's Office are the parties with cognizable interests in the due process violations raised by this motion to dismiss.  The Court, of course, has the same interest.  *United States v. Schaivo*, 504 F.2d 1, 6 (3d Cir. 1974) (relying on the legal certainty that "[t]he Sixth Amendment imposes a duty on the district courts no less than on prosecutors to take reasonable measures to ensure defendants fair trials"); *United States v. Lehder-Rivas*, 669 F. Supp. 1563, 1572 (M.D. Fla. 1987) (acknowledging district court's obligation to protect a defendant's right to a fair trial).  Given the unprecedented manner in which this case has been investigated, indicted and prosecuted, the interfering interests of Gibson Dunn and the Port Authority should be noted.

Gibson Dunn's interest has always been in concealing as much as possible.  That has been evident from the start, as the firm developed its dubious and now exposed "protocol" for conducting witness interviews.  Doc. No. 52 (Court's Opinion on the motion to quash).  Next came the massive document production, comprised of 17,000 page .pdfs that have no discernable rhyme or reason and an "organization" that seems deliberately obtuse.  Then there are the privilege assertions that a first-year lawyer could see are invalid, *e.g.*, communications between non-lawyers at different agencies; claims of the Deliberative Process Privilege over campaign documents.  Next, Gibson Dunn revealed its interest by providing (as it frequently does, *see, e.g.*, Mr. Baroni's Brief in support of his discovery motions) woefully inadequate privilege logs so that the U.S. Attorney's Office could not even decide whether to challenge the assertions.  That tactic, by the way, apparently worked because not one challenge was ever lodged.  And, of course, Gibson Dunn redacted documents for no legal reason, failed to list redacted documents on the redaction log (*e.g.*, the Governor's schedule for the week during which the "time for traffic" email was allegedly sent), and failed to provide sufficient information on those logs.

Finally, the Port Authority (alleged victim/prosecution team/litigant), has a single interest:  put this issue behind it and say as little as possible.  With all due respect to the PA, Mr. Baroni wants to put this matter behind him, but he faces more than a public relations problem.

His liberty, reputation and future are at issue.  Thus, whatever interest the PA might have (even as a non-party) it means nothing compared to Mr. Baroni's interest.

**E.     <u>Conclusion</u>**

The U.S. Attorney's Office failure to discharge its obligations and its capitulation to interference from Gibson Dunn and the PA have rendered this prosecution fundamentally unfair. It is time to settle accounts and dismiss this Indictment.  As this case now stands, Mr. Baroni has been deprived of and will continue to be deprived of the fundamental fairness guaranteed to criminal defendants since the Fifth Amendment was ratified on December 15, 1791.  Nor will Mr. Baroni receive the effective assistance of counsel given the information that has been and is still withheld from him.

## IV.   COUNTS ONE AND TWO OF THE INDICTMENT SHOULD BE DISMISSED FOR FAILURE TO ALLEGE A VIOLATION OF 18 U.S.C. § 666(a)(1)(A).

### A.   Introduction

Counts One and Two allege that Wildstein, Mr. Baroni and Ms. Kelly used "Port Authority property, including the time and services of unwitting Port Authority personal and other resources, to implement the lane and toll booth reductions and to conceal the Conspirators' true punitive purpose."   The prosecution claims that those allegations, if true, constitute a violation of 18 U.S.C. § 666(a)(1)(A).   Ultimately, the prosecution's use of § 666(a)(1)(A) is unprecedented and contrary to all legal authority.

Counts One and Two do not allege a violation of § 666(a)(1)(A) for three reasons.  First, the legislative history of § 666(a)(1)(A) demonstrates that the statute does not cover the alleged conduct.  Second, a careful review of cases prosecuted under § 666(a)(1)(A) demonstrates that the statute has never been applied as it is in this Indictment.   Third, the Rule of Lenity demonstrates why the Court should decline to read the statute as the prosecution urges.

### B.   The Statute and the Charges

At issue in this motion are the bolded terms in Section 666(a)(1)(A), which states in pertinent part:

> (a) Whoever, if the circumstance described in subsection (b) of this section exists —
>
> (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof —
>
> (A) embezzles, steals, **obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property**[10] that —
>
> (i) is valued at $5,000 or more, and
>
> (ii) is owned by, or is under the care, custody, or control of such organization, government, or agency …

---

[10] "Embezzles" and "steals" are not alleged in the Indictment; therefore, they are not at issue in this case.

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

In plain English – and as is well known given the press coverage of this matter – the U.S. Attorney's Office claims that Wildstein, Mr. Baroni, Ms. Kelly and others sought to punish Fort Lee Mayor Mark Sokolich for not endorsing Governor Christie's re-election campaign.  That is alleged in the Indictment as follows.

Count One of the Indictment charges that "[f]rom in or about August 2013 to in or about December 2013," Mr. Baroni and Ms. Kelly:

> knowingly and intentionally conspired and agreed with each other and others, including Wildstein, to obtain by fraud, otherwise without authority knowingly convert to their use and the use of others, and intentionally misapply property owned by and under the care, custody, and control of the Port Authority, with a value of at least $5,000, contrary to Title 18, United States Code, Section 666(a)(l)(A).

Ind. at 5.

Count Two of the Indictment charges that "[f]rom in or about August 2013 to in or about December 2013," Mr. Baroni and Ms. Kelly:

> with defendant BARONI and Wildstein being agents of the Port Authority, obtained by fraud, otherwise without authority knowingly converted to their use and the use of others, and intentionally misapplied property owned by and under the care, custody, and control of the Port Authority, with a value of at least $5,000. In violation of Title 18, United States Code, Section 666(a)(l)(A) and Section 2.

Ind. at 28.

### C.    The Legislative History Of § 666 Demonstrates That The Statute Does Not Cover The Conduct Alleged In Counts One And Two.

The legislative history of § 666 clearly demonstrates that Congress intended to criminalize a narrow class of theft and bribery offenses involving programs receiving federal

28

funds which federal law had previously not reached.  That statute was not written as a catch-all corruption statute.  The statute was enacted as part of the Comprehensive Crime Bill of 1984. *United States v. Cicco*, 938 F.2d 441, 444 (3d Cir. 1991).  The statute was "designed to create new offenses to <u>augment</u> the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies that are disbursed to private organizations of State and local governments pursuant to a Federal program."  S. Rep. No. 225 at 369, 98th Cong., 2d Sess., *reprinted in* 1984 U.S. Code Cong. & Admin. News 3182, 3510 (emphasis added).  In accordance with this intent, Congress captioned the statute "Theft or bribery concerning programs receiving Federal funds."

Prior to the enactment of § 666, the federal government lacked a criminal law to prosecute thefts involving programs receiving some federal funds.  Regarding the theft portion of the statute, the legislative history mentions 18 U.S.C. § 665[11] (theft or embezzlement by an officer or employee of an agency receiving assistance under the Job Training Partnership Act), which is narrowly applicable only to programs receiving funds under that Act, and then goes on to note that there is "no statute of general applicability in this area" except for 18 U.S.C. § 641[12] (theft of public property).  S. Rep. No. 225 at 369, 98th Cong., 2d Sess., *reprinted in* 1984 U.S. Code Cong. & Admin. News 3182, 3510.  However, 18 U.S.C. § 641 only applied if "the

---

[11] 18 U.S.C. § 665. Theft or embezzlement from employment and training funds; improper inducement; obstruction of investigations:

> (a) Whoever, being an officer, director, agent, or employee of, or connected in any capacity with any agency or organization receiving financial assistance or any funds under title I of the Workforce Innovation and Opportunity Act or title I of the Workforce Investment Act of 1998 knowingly enrolls an ineligible participant, embezzles, willfully misapplies, steals, or obtains by fraud any of the moneys, funds, assets, or property which are the subject of a financial assistance agreement or contract pursuant to such Act . . .

[12] 18 U.S.C. § 641. Public money, property or records:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof ....

property stolen is property of the United States." *Id.* Thus, § 641 did not criminalize thefts or bribery occurring after the funds had passed from the federal government to the recipient because the funds either became commingled with the recipient's funds or title of the funds was transferred to the recipient before it was stolen. *Id.*

Congress enacted § 666 as a gap filler to the theft statues, noting in particular that "even though title to the **monies** may have passed, the federal government clearly retains a strong interest in assuring the integrity of such program **funds**." *Id.* (emphasis added). In essence, prior to § 666, there was a loophole that prevented federal prosecutors from prosecuting cases against a narrow group of thefts; § 666 closed that loophole and nothing more. Similarly, the bribery portion of the statute, not at issue in this case, was enacted to augment or expand the prosecutorial power under 18 U.S.C. § 201 (Bribery of public officials) by curing the uncertainty as to whether a private employee may be prosecuted as a public official. S. Rep. No. 225 at 3370, 98th Cong., 2d Sess., *reprinted in* 1984 U.S. Code Cong. & Admin. News 3182, 3510. Congress's repeated use of the terms "monies" and "funds" demonstrates that the statute was intended primarily to combat financial crimes.

Accordingly, the Third Circuit has recognized that Congress enacted § 666 "to protect federal funds by authorizing federal prosecution of thefts and embezzlement from programs receiving substantial federal support even if the property involved no longer belonged to the federal government." *Cicco*, 938 F.2d at 445. In light of this legislative history, courts regularly refer to § 666 as a theft and bribery statute. *See Sabri v. United States*, 541 U.S. 600 (2004); *Fischer v. United States*, 529 U.S. 667 (2000); *Salinas v. United States*, 522 U.S. 52 (1997); *United States v. Valentine,* 63 F.3d 459, 463 (6th Cir. 1995); *United States v. Sanderson*, 966 F.2d 184, 188 (6th Cir. 1992).

The conduct alleged in Counts One and Two does not fit within the range of offenses Congress meant to criminalize by enacting § 666(a)(1)(A). Based on the legislative history, it is clear that Congress intended the "obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies"

30

subparts of are alternate ways in which an individual can accomplish a theft, in addition to the "embezzles" or "steals" subparts of § 666(a)(1)(A) not alleged in the Indictment.  The conduct alleged in Counts One and Two cannot be construed as a theft offense, which is what Congress meant to criminalize when enacting § 666(a)(1)(A).  Stated another way, even if Mr. Baroni and Ms. Kelly utilized Port Authority resources in order to intentionally increase traffic on a specific approach to the George Washington Bridge (which they did not) such actions do not constitute conduct which Congress intended to or foresaw criminalizing when it passed the statute.

### D. The Case Law Demonstrates The Allegations In Counts One And Two Are Is Not Covered by § 666(a)(1)(A).

#### 1. Introduction

A thorough review of reported cases of § 666(a)(1)(A) prosecutions and convictions demonstrates that the allegations underlying Counts One and Two cannot constitute a violation of § 666(a)(1)(A).  In the identifiable "obtained by fraud" or "knowingly converts" cases the defendants, someone close to them, or a business or organization associated with the defendant received money, property, or services by intentionally deceiving entities or programs which received federal benefits.[13]  Similarly, cases prosecuted under the "intentionally misapply" subpart of the statute involve misuse of public funds for unauthorized purposes or in an unauthorized way, and by which some party derives a benefit.  Under any theory, the cases establish that the conduct alleged in the Indictment is inconsistent with the manner in which federal courts had faces and addressed § 666(a)(1)(A) charges.  Mr. Baroni received nothing based upon these allegations.

#### 2. Courts Have Voiced Concerns About The Broad Language in §666.

Courts have noted concerns about the very broad language contained in 666.  In contemplating the contours of the "intentionally misapplies" subpart of §666(a)(1)(A), the

---

[13] While many cases do not specifically state the particular subpart of § 666(a)(1)(A) the defendant is accused of violating, the identified cases all specifically reference the statute's "obtains by fraud" or "knowingly converts" language.

Eleventh Circuit observed that a broad reading "turns all (or a goodly fraction of) state-law errors or political considerations in state procurement into federal crimes." *United States v. Thompson*, 484 F.3d 877, 881 (7th Cir. 2007).  The court held that the statute could not be given such a broad reading "lest the judiciary create, in common-law fashion, offenses that have never received legislative approbation, and about which adequate notice has not been given to those who might be ensnared."  *Id.* at 881 (*citing Staples v. United States*, 511 U.S. 600, 619 n.17 (1994).   The *Thompson* court provides an illuminating example of the absurd and unconstitutional prosecutions that could result when criminal statutes, in this case 18 U.S.C. § 1346 are used criminalize politics.

> Suppose that a city's mayor supports building a football stadium or power plant in Neighborhood A rather than B because residents of A want the project while residents of B have a NIMBY reaction, and the mayor concludes that he is more likely to be reelected if he can keep residents of both neighborhoods happy by ensuring that Neighborhood A gets the project.  That is both self-interested (the mayor secures extra tenure) and public-interested (the populace as a whole is more satisfied).  That's politics: people get and keep office by giving the people what they want, even if that is not what they "need" by some higher calculus.  Imagine a governor who throws support (and public funding) behind coal-fired power plants because people fear nuclear power rather than because of a cost-benefit analysis; that may be a blunder but is not a crime even if the governor privately thinks that nuclear power would be superior.  Similarly, supporting local vendors, a form of "pork," may or may not be good government but is not a "misuse of office" in the criminal sense.  The idea that it is a federal crime for any official in state or local government to take account of political considerations when deciding how to spend public money is preposterous.

*Id.* at 881.  The court concluded that "Sections 666 and 1346 have an open-ended quality that makes it possible for prosecutors to believe, and public employees to deny, that a crime has occurred, and for both sides to act in good faith with support in the case law."  *Id.* at 884.

The Seventh Circuit has also found that a broad interpretation of § 666 advocated by the government was not acceptable because it would impermissibly criminalize normal politics:

> A bureaucrat who tells sanitation and snow removal employees to ensure that the mayor's neighborhood is cleaned up early and often may or may not have committed a political sin, but he has not committed the crime of bribery; no more so when he diverts employees' time to more overtly political endeavors. Speedy pothole repair for neighborhoods that support the incumbent is common in municipal government, and we do not for a second suppose that putting salaried workers to this political end is bribery—yet that is an implication of the prosecution's theory.

*United States v. Genova*, 333 F.3d 750, 759 (7th Cir. 2003).  The present case bares significant similarities to these hypotheticals which multiple circuit courts have found could not fall within a permissible interpretation of the statute.

> 3.   Section 666(a)(1)(A) "Obtain by Fraud" and "Knowingly Converts" Cases in This Circuit Are Inconsistent With The Allegations In This Indictment.

All reported cases located in this Circuit follow a pattern in which some party derives a <u>tangible</u> benefit in the form of money, property, or services as a result of the fraud or conversion:

- In *United States v. Vas*, the former mayor of Perth Amboy was convicted under § 666(a)(1)(A) for fraudulent and intentional misapplication of funds involving a local government receiving federal funds because he sold a property he owned to a developer at an inflated price in exchange for assurances from the mayor that he would make sure the developer received public funds to redevelop the property. 497 F. App'x 203, 205 (3d Cir. 2012).   In *Vas*, the defendant fraudulently obtained and misapplied funds in order to benefit the developer and thus justify the inflated price paid by the developer.

- In *United States v. James*, the former mayor of Newark was convicted of obtaining property by fraud by under § 666(a)(1)(A) for carrying out a scheme in which "James steered sales of real property owned by the City of Newark to his paramour, Tamika Riley."  513 F. App'x 232, 232-33 (3d Cir. 2013); *see also United States v. Riley*, 621 F.3d 312 (3d Cir. 2010).  With Mr. James's help, Ms.

Riley obtained property, as well as money from the eventual sale of the land, by participating in the scheme.

- In *United States v. Lauderdale*, Philadelphia city employees were convicted of obtaining money and property by fraud under § 666(a)(1)(A) by orchestrating a scheme in which they submitted fraudulent invoices to the city on behalf of a vendor in exchange for kickbacks from the vendor.  142 F. App'x 25, 27 (3d Cir. 2005).

- In *United States v. Stout*, union officials were convicted under § 666(a)(1)(A) for defrauding a hospital receiving federal funds by hiring union supporters as "ghost" employees for no-show jobs.   No. CRIM. 89-317-1-2-3, 1990 WL 136341, at *1 (E.D. Pa. Sept. 18, 1990) *aff'd sub nom. Shramko v. United States*, 932 F.2d 961 (3d Cir. 1991) and *aff'd sub nom. United States v. Bullock*, 932 F.2d 961 (3d Cir. 1991) and *aff'd*, 932 F.2d 962 (3d Cir. 1991).

- In *United States v. Vella*, a contractor was convicted under § 666(a)(1)(A) for participating in a bid-rigging scheme which paid kickbacks to a City of Linden employee charged with overseeing the program.   414 F. App'x 400, 402 (3d Cir. 2011).

- In *United States v. Vitillo*, the defendant and his company were convicted under § 666(a)(1)(A) for orchestrating "a massive overbilling scheme to defraud" the local airport authority that received funds from the FAA.  490 F.3d 314, 319 (3d Cir. 2007), as amended (Aug. 10, 2007).

- In *United States v. Weaver*, the administrators of an adult education program that received federal funds were convicted under § 666(a)(1)(A) for paying friends and family members to teach classes that never occurred.  220 F. App'x 88, 90 (3d Cir. 2007).

- In *United States v. Wecht*, a county coroner was prosecuted under § 666(a)(1)(A) for using county vehicles and employees to drive him to private engagements, submitting false travel agency bills and false limousine reports and, using county employees to perform other personal work for his own private financial gain.  No. CRIM. 06-0026, 2006 WL 1835818, at *1 (W.D. Pa. June 29, 2006).

- In *United States v. Richards*, the defendant was prosecuted under § 666(a)(1)(A) for obtaining by fraud and knowingly converting money from low-income housing program administered by Farmers Home Administration when he made unauthorized withdrawals from the program account.  9 F. Supp. 2d 455 (D.N.J. 1998).  The *Richards* Court repeatedly referred to the defendants actions as embezzlement.

In all these cases, the defendant, the defendant's company or someone close to him received an identifiable benefit either in money, property, or services.  These prosecutions are all consistent with Congress's state purpose of enacting § 666(a)(1)(A), to "vindicate significant acts of theft, fraud, and bribery involving Federal monies that are disbursed to private organizations of State and local governments pursuant to a Federal program."  S. Rep. No. 225 at 369, 98th Cong., 2d Sess., *reprinted in* 1984 U.S. Code Cong. & Admin. News 3182, 3510.  Again, Mr. Baroni received nothing.

4. Section 666(a)(1)(A) "Obtains by Fraud" and "Knowingly Converts" Cases in Other Circuits Are Inconsistent With The Allegations In This Indictment.

Outside of this Circuit, application of § 666(a)(1)(A) has also been consistent with Congress's purpose of prosecuting acts of theft and fraud committed against programs receiving federal monies:

- In *United States v. Abu-Shawish*, the executive director of a non-profit was convicted of federal program fraud in violation of § 666(a)(1)(A) for using the

proceeds of a grant partially funded by HUD for personal expenses and for payment for work not actually performed.  507 F.3d 550, 552 (7th Cir. 2007).

- In *United States v. Robinson*, a municipal employee and charter school chairman was convicted of obtaining money by fraud in violation of § 666(a)(1)(A) for falsely submitting time sheets and receiving a salary for work that was never done, as well as for contracting with a vendor, which the defendant partially owned, to perform work for the charter school.  781 F.3d 453, 458 (8th Cir. 2015); 903 F. Supp. 2d 766, 773 (E.D. Mo. 2012).

- In *United States v. Schmitz*, the defendant was prosecuted under § 666(a)(1)(A) for collecting over $177,000 in salary and other benefits from a federally funded program even though she performed little or no work, generated virtually no services or work product, and rarely showed up at program's offices.  634 F.3d 1247, 1251 (11th Cir. 2011).

- In *United States v. Baldridge*, a county commissioner was convicted under § 666(a)(1)(A) for authorizing the disbursement of county funds to contractors for work either not done or done for his personal benefit, or the benefit of his family and friends.  559 F.3d 1126, 1129 (10th Cir. 2009).

- In *United States v. Williams*, a city clerk and city payroll clerk were prosecuted under § 666(a)(1)(A) for writing checks to themselves without authorization and to which they were not entitled.  507 F.3d 905, 906 (5th Cir. 2007).

- In *United States v. Cornier-Ortiz*, the general manager and shareholder of a company managing a public housing project receiving federal funds hired a "ghost" employee to do work that was actually performed by another individual who was not authorized to do such work, due to a conflict of interest.  361 F.3d 29, 34 (1st Cir. 2004).

36

- In *United States v. Newell*, an Indian tribe official was convicted of conspiring to violate § 666(a)(1)(A) by paying salaries to individuals who did no actual work and causing the tribe's "various programs to 'loan' hundreds of thousands of dollars each year to the Tribe which he then disbursed in the form of 'general assistance' to Tribe members, including friends, family and political supporters." 658 F.3d 1, 5 (1st Cir. 2011).

- In *Fischer v. United States*, the president and part owner of a private health care billing company was convicted under § 666(a)(1)(A) for using a loan secured from a hospital receiving federal funds to pay off the company's creditors and invest in speculative securities, as well as using part of the loan amount to pay a kickback to the hospital administrator who approved the loan.  529 U.S. 667, 670 (2000).

- In *United States v. Sanderson*, a supervisor in the county sheriff's office and part-time contractor was convicted under § 666(a)(1)(A) for using supplies for county projects on his private construction projects, as well as using county employees to perform work on these private projects.  966 F.2d 184, 186 (6th Cir. 1992).

- In *United States v. Freeman*, a municipal housing authority employee was convicted under § 666(a)(1)(A) for submitting a forged housing authority letter to a bank in order to secure a personal loan and using housing authority funds to pay interest on the personal loan.  86 F. App'x 35, 37 (6th Cir. 2003).

- In *United States v. Spano*, a municipal director of public safety and his co-conspirators were convicted under § 666(a)(1)(A) for inflating the cost of an internal investigation commissioned by the municipality and skimming off the difference between the actual cost and inflated cost.  401 F.3d 837, 839 (7th Cir. 2005).

37

- In *United States v. Swan*, a contractor was prosecuted under § 666(a)(1)(A) for falsely reporting the cost of a construction project to a town receiving federal funds and causing the town to overpay for the project.  No. 1:12-CR-00027-JAW-1, 2012 WL 7219008, at *1 (D. Me. Nov. 26, 2012) <u>aff'd</u>, No. 1:12-CR-00027-JAW-1, 2013 WL 685217 (D. Me. Feb. 25, 2013).

- In *United States v. Thomas*, a city council member was convicted under § 666(a)(1)(A) for using funds "intended for youth-based programs in the District of Columbia, but were misdirected by Thomas for other uses, including for his own personal benefit."  862 F. Supp. 2d 19, 20 (D.D.C. 2012).

- In *United States v. Ollison*, a school district employee was prosecuted under § 666(a)(1)(A) for using an official school district credit card to make numerous personal purchases.  No. CRIM.A. 3:06-CR-272L, 2007 WL 580619, at *1 (N.D. Tex. Feb. 23, 2007).

- In *United States v. Mirikitani*, a city council member was convicted under § 666(a)(1)(A) for granting municipal employees bonuses in exchange for their agreement to donate a portion of the bonuses to the defendant's campaign fund. 380 F.3d 1223, 1224 (9th Cir. 2004).

- In *United States v. Walsh*, a corrections officer was prosecuted under § 666(a)(1)(A) for falsely reporting the amount of hours he worked and in doing so collecting pay to which he was not entitled. No. 15-CR-91 (ADS), 2016 WL 211916, at *1 (E.D.N.Y. Jan. 15, 2016).

- In *United States v. Hoover-Hankerson*, a CJA attorney and investigator were convicted under § 666(a)(1)(A) for orchestrating a scheme in which witness appearance and investigation vouchers were cashed in for witnesses who never

appeared and for investigation work that was never performed.  406 F. Supp. 2d 76, 79 (D.D.C. 2005), *aff'd*, 511 F.3d 164 (D.C. Cir. 2007).

- In *Temple v. United States*, the defendants were convicted under § 666(a)(1)(A) for orchestrating scheme in which state board of education officials steered contracts to companies controlled by one of the defendants in exchange for campaign contributions. No. 1:04-CR-0568-2-CC, 2012 WL 7763027, at *2 (N.D. Ga. Dec. 27, 2012) *report and recommendation adopted,* No. 1:04-CR-0568-CC-2, 2013 WL 1129408 (N.D. Ga. Mar. 19, 2013).

- In *United States v. Hunter*, the administrator of a summer basketball program for creating fictitious timesheets for employees, cashing the checks with forged endorsements, and retaining the proceeds for himself.  No. 3:06CR237 JBA, 2006 WL 3334607, at *4 (D. Conn. Nov. 16, 2006).

- In *United States v. Askia*, the administrator a company receiving a grant from the Department of Education was prosecuted under § 666(a)(1)(A) for using grant funds for personal expenses.  No. 1:13-CR-10004, 2015 WL 9685586, at *2 (W.D. Ark. Nov. 10, 2015) *report and recommendation adopted,* No. 13-CR-10004, 2016 WL 110586 (W.D. Ark. Jan. 8, 2016).

- In *United States v. Hudson*, a contractor for a school district charged with setting up a television station was prosecuted under § 666(a)(1)(A) for fraudulently obtaining over $200,000 by inflating expenses for work performed and submitting false invoices. 491 F.3d 590, 591 (6th Cir. 2007).

- In *United States v. Hultman*, the administrator of long term health care facility receiving Medicaid funding was convicted under § 666(a)(1)(A) for misappropriating assets to pay for personal expenses.  26 F. App'x 60, 61 (2d Cir. 2001).

39

- In *United States v. Geeslin*, the a municipal chief of police was convicted under § 666(a)(1)(A) for submitting fraudulent pay sheets and collecting pay for duties that were never actually performed. 447 F.3d 408, 409 (5th Cir. 2006).

- In *United States v. Short*, a city employee was convicted under § 666(a)(1)(A) for submitting fraudulent documentation in order to secure a grant from a federally-funded housing program.  No. CRIM. A. 99-320, 1999 WL 1201869, at *1 (E.D. La. Dec. 13, 1999).

- In *United States v. Lanham*, the defendant was convicted under § 666(a)(1)(A) for perpetrating an "elaborate scheme between 2004 and 2008 in which he arranged for the substantial and unapproved overbilling of the United States Department of Education for the services of employees or consultants he oversaw through his business."  541 F. App'x 34, 35 (2d Cir. 2013).

- In *United States v. Madrid*, the defendant was convicted under § 666(a)(1)(A) for participating in a scheme in which a company submitted fraudulent invoices for mental health services to a county which were not rendered, which the defendant was also paid for.  610 F. App'x 359, 368 (5th Cir. 2015).

- In *United States v. Dwyer*, defendant was convicted of conspiring to commit program fraud under § 666(a)(1)(A) for agreeing with her workplace superiors at government-subsidized career development agency to pay agency employees for hours never worked, and for defendant ordering and preparing checks and time sheets needed for overpayments to employees.  238 F. App'x 631 (1st Cir. 2007).

- In *United States v. Suarez* a former police officer "was convicted by a jury of two violations of 18 U.S.C. § 666(a)(1)(A) for converting police evidence and victim restitution money to his own benefit. 263 F.3d 468, 471-72 (6th Cir. 2001).

Again, the use of § 666(a)(1)(A) in all the above-referenced cases demonstrates that the statute covers exactly what Congress intended it to, thefts from programs receiving funds which are accomplished by obtaining by fraud, or knowingly converting or intentionally misapplying property for personal benefit.  As with a traditional theft offense, someone always receives something of value.  The conduct alleged in the present Indictment does not fit into this framework.  The Indictment in the present matter does not identify any identifiable benefit received by anyone involved in the alleged conduct.  Such a situation is inconsistent with traditional embezzlement and theft offenses Congress intended for § 666(a)(1)(A) to cover.

5.      Cases Relying on and Interpreting "Intentionally Misapplies" Subpart of § 666(a)(1)(A) Are Inconsistent the Allegations In This Indictment.

The vagueness and broadness of the "intentionally misapplies" subpart of § 666(a)(1)(A) has consistently troubled courts attempting to outline its boundaries.  *See United State v. Jimenez*, 705 F.3d 1305, 1308 (11th Cir. 2013) ("Courts have struggled to discern § 666's contours, especially the modified verb intentionally misapplies.").  Courts have recognized that under the Rule of Lenity the "intentionally misapplies" subpart must be given a narrow meaning.  *Id.* at 1039; *See also United States v. Thompson*, 484 F.3d 877, 881 (7th Cir. 2007).

For example, in *Thompson*, a section chief on Wisconsin's Bureau of Procurement, was charged with intentionally misapplying state funds, in violation of § 666(a)(1)(A), by awarding a portion of the state's travel budget to an agency that, according to Wisconsin procurement procedures, should not have been awarded the contract. 484 F.3d at 878-89.  The prosecution alleged that Thompson awarded the contract because her boss had connections to the travel agency or as the prosecution put it – "for political reasons[.]"  *Id.* at 878.  The Seventh Circuit reversed Thomson's conviction.  *Id.* at 844.  Observing vagueness in the statute, the court based its holding on a narrow reading of "intentionally misapplies" to find that Thompson <u>derived no benefit</u> and the state received what it paid for, namely a travel agent.  *Id.* at 844.  The Seventh Circuit's reasoning is worth examining:

41

Faced with a choice between a broad reading that turns all (or a goodly fraction of) state-law errors or political considerations in state procurement into federal crimes, and a **narrow reading that limits § 666 to theft, extortion, bribery, and similarly corrupt acts**, a court properly uses the statute's caption for guidance. That plus the Rule of Lenity, which insists that ambiguity in criminal legislation be read against the prosecutor, lest the judiciary create, in common-law fashion, offenses that have never received legislative approbation, and about which adequate notice has not been given to those who might be ensnared.

Imagine how the prosecutor's reading of § 666 would apply to a state official charged with implementing the Medicaid program. Someone applies for payment of medical expenses; a state employee approves; later it comes to light that the applicant made just a little too much money to be eligible, so the decision was erroneous. A violation of regulations and perhaps of some statutes has occurred, but is the error a crime? As we read § 666, the answer is no unless the public employee is on the take or the applicant is a relative (for indirect benefits are another form of payoff). An error—even a deliberate one, in which the employee winks at the rules in order to help out someone he believes deserving but barely over the eligibility threshold—is a civil rather than a criminal transgression. Likewise the sin is civil (if it is any wrong at all) when a public employee manipulates the rules, as Thompson did, to save the state money or favor a home-state producer that supports elected officials.

*Thompson*, 484 F.3d at 881 (emphasis added) (internal citations omitted).

Similarly, the Eleventh Circuit has also limited the broad "intentionally misapplies" language. In *Jimenez,* the court overturned a conviction under § 666(a)(1)(A) on the basis that one must actually have authority over funds to intentionally misapply them. 705 F.3d at 1311. Jimenez was the deputy director of Head Start, a federally funded program that provided education and health care to low-income preschoolers. *Id.* at 1306. He was prosecuted for intentionally misapplying funds because Head Start bought over $9,000 worth of books that were authored by his wife, which of course benefited him. *Id.* at 1307. The court overturned Jimenez's convictions, finding that the purchase was authorized by another Head Start employee, over whom Jimenez did not exercise any control. *Id.* at 1311. Thus, the court overturned his conviction since Jimenez could not intentionally misapply what he did not have control over. *Id.*

42

The erroneous § 666(a)(1)(A) prosecutions *Thompson* and *Jimenez* bare striking similarity to what the prosecution is attempting to do in this case. As in *Thompson*, Mr. Baroni and Ms. Kelly derived no identifiable benefit from the alleged conduct, unlike in theft and embezzlement offenses which Congress intended to target. Also, as in *Thompson*, the government has alleged that the supposed conduct was motivated by political reasons, which the prosecution considers to be wrongful. And, as in *Thompson*, even if it occurred (which it did not) that conduct is not criminalized by § 666.

The "intentionally misapplies" subpart has been applied principally in situations where funds are allocated for a specific purpose, but directed elsewhere, by a person with control over funds, in contravention of the authorized purpose for the funds:

- In *U.S. v. Urlacher*, a police chief was convicted of intentional misapplication of police department funds in violation of § 666(a)(1)(A) when a total of $313,868.81 of police department funds which the chief controlled was unaccounted for over a five year period and the chief engaged in an extensive effort to conceal the misappropriation of the money including condoning the making of false accounting entries in the police books. 979 F.2d 935 (2d Cir. 1992). The chief could only establish that a small portion of the missing funds went to legitimate police purposes. *Id.*

- In *United States v. Cameron*, an administrator of a service organization receiving federal funds was convicted of misapplying funds under § 666(a)(1)(A) for spending those funds on her own political campaign and for writing checks to herself without providing and justification or documentation. 86 F. App'x 183, 185 (7th Cir. 2004).

- In *United States v. Naiman*, the administrator of a non-profit receiving federal funds was convicted us misapplying funds under § 666(a)(1)(A) for cashing

checks made out to a vendor but apparently never providing the funds to the vendor specified on the checks. 211 F.3d 40, 47 (2d Cir. 2000).

- In *United States v. Thompson*, three co-defendants were convicted of conspiring to intentionally misapply public funds under § 666(a)(1)(A) by using public road building funds to pave private drive ways and roads in exchange for votes. 501 F. App'x 347, 349 (6th Cir. 2012).

- In *United States v. Bruno*, CRIM. 3:11-15, 2014 WL 2895415 (W.D. Pa. June 25, 2014) *aff'd*, 614 Fed. Appx. 72 (3d Cir. 2015), Bruno, a former superintendent of a Pennsylvania school district, was charged with violating § 666(a)(1)(A). *Id.* at *1-2. Bruno's violation was based on intentionally misapplying government funds, namely a federal grant, that were earmarked for increasing the reliability and availability of high speed internet to rural areas within the school district. *Id.* Instead of using the funds for the stated purpose, Bruno directed disbursements to other individuals. *Id.* at *9-10.

- In *United States v. Karron*, 07 Cr. 541 (RPP), 2008 WL 4620819 (S.D.N.Y. Oct. 16, 2008) *aff'd* 348 Fed. Appx. 632 (2d Cir. 2009), a former president and chief technology officer of a research company was convicted of violating § 666(a)(1)(A) for misapplying federal funds that were only to be used for direct research expenses for a specific project. *Id.* at *1. In violation of the grant terms, the defendant used grant funds for indirect or overhead costs associated with the company instead of directly for research, as well as for personal use, such as his personal salary, rent, and credit card bills. *Id.* at *5.

The alleged conduct in this case is unlike any successful prosecution under the § 666(a)(1)(A) "intentionally misapplies" subpart. Unlike the above-referenced cases, there is no allegation of Mr. Baroni, Mr. Wildstein, or Ms. Kelly ever directed the allegedly misapplied funds or actual property for any purpose, as there is no allegation that Mr. Baroni, Mr. Wildstein,

or Ms. Kelly breached any established regulation governing the administration of traffic studies or the realignment of lanes.

As noted, *supra*, the Indictment alleges that Wildstein, Mr. Baroni Ms. Kelly used "Port Authority property, including the time and services of unwitting Port Authority personal and other resources, to implement the lane and toll booth reductions and to conceal the Conspirators' true punitive purpose."  However, there is not a single allegation that any property, money, or employee time was used in an unauthorized way or for a purpose that it was not meant to, as in all the above-referenced cases.  The traffic engineers were paid for work within the scope of their normal duties.  The toll collectors collected tolls.  The public relations staff interacted with the public and the media.  The police directed traffic.  The bridge and lanes carried cars.  Simply put, the Indictment fails to allege the knowing misapplication within in the meaning of § 666(a)(1)(A).  Finally, unlike the above-referenced cases, Mr. Baroni, Mr. Wildstein, and Ms. Kelly did not receive any identifiable benefit from their alleged conduct, which is inconsistent with Congress's stated intent in enacted § 666(a)(1)(A).

6.     The Rule of Lenity

As discussed, *supra*, courts have struggled with the broad and ambiguous language of § 666.  *See, e.g.*, *Cicco*, 938 F.2d at 444 ("[W]e agree with the district court that the text of § 666 is ambiguous.").  Where a court is called upon to decipher such a statute's reach, the Rule of Lenity requires a narrow reading.  *See Thompson*, 484 F.3d at 881 (noting that the Rule of Lenity "insists that ambiguity in criminal legislation be read against the prosecutor, lest the judiciary create, in common-law fashion, offenses that have never received legislative approbation, and about which adequate notice has not been given to those who might be ensnared") (citing *Staples v. United States*, 511 U.S. 600, 619 n.17 (1994)).  Thus, in this case – where the prosecution is unprecedented and requires a broad reading of the statute – the Court should adhere to the Rule of Lenity and decline to interpret § 666 as having created offenses never contemplated by

45

Congress and to which the public had no notice.  For this reason as well, Counts One and Two should be dismissed.

      **E.**    **Conclusion**

The U.S. Attorney's Office concluded that the lane closures were vindictive.  That Office searched for something – anything – it could use to bring charges.  The Office found a statute it had used for years to prosecute public officials for taking money, bribes and property from local and state entities to enrich themselves.  That is exactly why Congress passed § 666.  Here, faced with no federal law that applies to the alleged conduct, the prosecution has ignored the legislative history, the cases applying the statute, and the Rule of Lenity.  For all these reasons, Counts One and Two fail to adequately allege a violation of or a conspiracy to violate § 666(a)(1)(A) and should be dismissed.

## V.   COUNTS EIGHT AND NINE SHOULD BE DISMISSED FOR FAILURE TO ALLEGE A VIOLATION OF 18 U.S.C. §§ 241 AND 242.

Count Eight charges a violation of 18 U.S.C. §241, alleging that "[b]etween in or about August 2013 and on or about September 13, 2013, in the District of New Jersey and elsewhere," Mr. Baroni and Ms. Kelly:

> knowingly and willfully conspired and agreed with each other and others, including Wildstein, to injure and oppress the residents of Fort Lee in the free exercise and enjoyment of the rights and privileges secured to them by the Constitution and laws of the United States, namely, the right to localized travel on public roadways free from restrictions unrelated to legitimate government objectives.

Ind. at 33.

Count Nine charges a violation of 18 U.S.C. § 242, claiming that "[b]etween in or about August 2013 and on or about September 13, 2013, in the District of New Jersey and elsewhere," Mr. Baroni and Ms. Kelly:

> with defendant BARONI, defendant KELLY, and Wildstein acting under color of law, knowingly and willfully deprived the residents of Fort Lee of the rights, privileges, and immunities secured and protected by the Constitution and laws of the United States, namely, the right to localized travel on public roadways free from restrictions unrelated to legitimate government objectives.

Ind. at 36.

Counts Eight and Nine do not allege a violation of the conduct criminalized by 18 U.S.C. §§ 241 and 242 because those Counts do not allege that Mr. Baroni or Ms. Kelly impeded anyone from the free exercise of "any right or privilege secured to him by the Constitution or laws of the United States" or deprived anyone of "any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States."  18 U.S.C. §§ 241, 242.  The "right to localized travel on public roadways free from restrictions unrelated to legitimate government objectives," Ind. at 33, 36, is not a right protected by §§ 241 or 242.  Accordingly, Counts Eight and Nine fail to allege a violation of the charged statutes.

Section 242 is "a Reconstruction Era civil rights statute making it criminal to act (1) willfully and (2) under color of law (3) to deprive a person of rights protected by the Constitution or laws of the United States." *United States v. Lanier*, 520 U.S. 259, 264 (1997) (internal quotations and citations omitted).

> The general language of § 242, referring to "the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States," is matched by the breadth of its companion conspiracy statute, § 241, which speaks of conspiracies to prevent "the free exercise or enjoyment of any right or privilege secured to [any person] by the Constitution or laws of the United States." Thus, in lieu of describing the specific conduct it forbids, each statute's general terms incorporate constitutional law by reference ….

*Id.* at 264-65.

Criminal liability under the statutes "may be imposed for deprivation of a constitutional right if, but only if, 'in the light of pre-existing law the unlawfulness under the Constitution is apparent[.]'" *Id.* at 271-72 (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (original internal brackets omitted)). A defendant cannot be tried "for an offense, the nature of which the statute does not define and hence of which it gives no warning." *Id.* at 267 (quoting *Screws v. United States*, 325 U.S. 91, 101 (1945)) (internal quotation marks omitted). Sections 241 and 242 apply to rights that have "been made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them." *Id.* Thus, the statutes are limited to "rights fairly warned of, having been 'made specific' by the time of the charged conduct." *Id.* at 267.

Although the Supreme Court has recognized a fundamental right to *inter*state travel, *Shapiro v. Thompson*, 394 U.S. 618 (1969), it has never addressed whether such a right has extended to *intra*state travel. *See Meml. Hosp. v. Maricopa County*, 415 U.S. 250, 255-56 (1974). The Third Circuit has found a fundamental right of intrastate travel based on the Due Process Clause of the Fourteenth Amendment. *Lutz v. City of York, Pa.*, 899 F.2d 255, 267 (3d Cir. 1990). In *Lutz*, the city of York, Pennsylvania, responding to a popular activity known as

48

"cruising," enacted an ordinance that prohibited a person from driving more than twice in a two-hour window in specific streets during certain times of the day. *Id.* at 257. Any person found to be in violation of the ordinance would be fined. *Id.* Lutz brought an action challenging the ordinance on the grounds that it violated his fundamental right to travel. *Id.* at 258.

Recognizing that the Supreme Court had not addressed the issue of a right to intrastate travel, the Third Circuit thoroughly analyzed any, and likely every, source from which such a right could be derived. *Id.* at 266-68. Ultimately, the court found that "no constitutional text other than the Due Process Clauses could possibly create a right of localized intrastate movement[.]" *Id.* at 267. The court described the right as "the right to travel locally through public spaces and roadways." *Lutz*, 899 F.2d at 268. The court cautioned that despite finding support for such a right, it was "unquestionably ad hoc[.]" *Id.*

However, a fundamental right to intrastate travel is not violated in the absence of complete deprivation of the <u>right</u> to move, *i.e.*, a <u>prohibition</u> against driving somewhere under penalty of a fine. For instance, in an action under 42 U.S.C. § 1983,[14] plaintiffs claimed a deprivation of the right to intrastate travel because newly enacted traffic ordnances created one-way streets, which hindered plaintiffs' ability to travel. *Lanin v. Borough of Tenafly*, 2:12-02725 KM MCA, 2014 WL 31350, at *9 (D.N.J. Jan. 2, 2014). Ultimately, this Court dismissed plaintiffs' count because it "failed to plead a claim of deprivation of a fundamental right." *Id.* This Court reasoned that plaintiffs "do not allege a single instance of actually being prevented from entering or leaving their home or neighborhood. Nor is anyone attempting to prohibit or prevent them from traveling." *Id.* The Court noted that <u>"[t]raffic, even if it can be attributed to poor public planning, is not a deprivation of a fundamental right. Nor does it violate any fundamental right to require that auto traffic, at certain times of day, take a route that turns out to be more circuitous[.]"</u> *Id.* (emphasis added).

_____

[14] The Supreme Court has recognized that the test to determine the constitutional scope of a right under 18 U.S.C. §§ 241, 242 is the same as determining qualified immunity under 42 U.S.C. § 1983. *United States v. Lanier*, 520 U.S. 259, 272 (1997).

Likewise, in *Varriale v. Borough of Montvale*, the District Court held that there was no violation of a right of intrastate travel when a person was not actually deprived of entering or leaving a locality.   CIVA 04-199 (JLL), 2006 WL 1806411, at *11 (D.N.J. June 29, 2006).   Mr. Varrale brought an action under 42 U.S.C. § 1983 against defendant, a Park Ridge police sergeant, alleging a deprivation of his constitutional right to intrastate travel because defendant threatened Varriale that he would be pulled over if he entered Park Ridge.  *Id.* at *10.   This Court granted defendant's motion for summary judgment because there was no allegation the sergeant actually denied the right to intrastate travel since Varriale did in fact travel within Park Ridge after the incident.   *Id.* at *11.   Finding no "evidence of constitutional injury," this Court ultimately dismissed the count.  *Id.*

Many jurisdictions have found no constitutional violation based on an impediment to travel.  *See, e.g.*, *Torraco v. Port Auth. of New York and New Jersey*, 615 F.3d 129, 140-41 (2d Cir. 2010) (finding that a one-day delay at the airport did not amount to a constitutional violation because "minor restrictions on travel simply do not amount to the denial of a fundamental right."); *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 54 (2d Cir. 2007) (holding that a restriction on a type of ferry, which increased travel times, did not amount to a constitutional violation);  *Doe v. Moore*, 410 F.3d 1337, 1348 (11th Cir. 2005) ("[m]ere burdens on a person's ability to travel from state to state are not necessarily a violation of their right to travel."); *Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991) ("If every infringement on interstate travel violates the traveler's fundamental constitutional rights, any governmental act that limits the ability to travel interstate, such as placing a traffic light before an interstate bridge, would raise a constitutional issue."); *Soto-Lopez v. New York City Civ. Serv. Commn.*, 755 F.2d 266, 278 (2d Cir. 1985) *aff'd sub nom. Atty. Gen. of New York v. Soto-Lopez*, 476 U.S. 898 (1986) ("Merely having an effect on travel is not sufficient to raise an issue of constitutional dimension."); *City of Houston v. FAA*, 679 F.2d 1184, 1198 (5th Cir. 1982) ("At most, [plaintiff's'] argument reduces to the feeble claim that passengers have a constitutional right to the most convenient form of travel. That notion … finds no support whatsoever in [the Supreme

50

Court's right of interstate travel jurisprudence.]"); *New York State Rifle & Pistol Ass'n v. City of New York*, 86 F. Supp. 3d 249, 264 (S.D.N.Y. 2015) (holding that a restriction on the transportation of a firearm did not amount to a violation of inter or intrastate travel); *Dickerson v. City of Gretna*, CIV.A. 05-6667, 2010 WL 420552, at *4 (E.D. La. Feb. 1, 2010) ("[T]emporary delay in crossing the bridge does not amount to the denial of the [plaintiffs'] fundamental right to interstate travel."); *Campbell v. Westchester County*, 96 CIV. 0467 (JSM), 1998 WL 788791, at *1 (S.D.N.Y. Nov. 10, 1998) (finding no violation of the right to intrastate travel when plaintiff was required to inform police before going to a hospital).   Taken together, these cases demonstrate that burdens on and delays in travel (*i.e.*, traffic) do not rise to the level of a deprivation of the right to travel either intrastate or interstate.

A "right to localized travel on public roadways free from restrictions unrelated to legitimate government objectives" does not exist.  A court in this district has found that "[t]raffic […] is not a deprivation of a fundamental right."  *Lanin*, 2014 WL 31350, at *9.  As no such right exists, Counts Eight and Nine should be dismissed.

## VI.   <u>**CONCLUSION**</u>

For the foregoing reasons, Mr. Baroni respectfully requests that the Court dismiss the Indictment or, in the alternative, Counts One, Two, Eight and Nine.

Respectfully,

**BALDASSARE & MARA, LLC**

By:_____
      Michael Baldassare

By:_____
      Jennifer Mara

**BALDASSARE & MARA, LLC**
570 Broad Street
Newark, New Jersey 07102
Telephone: (973) 200-4066
Facsimile: (973) 556-1076

*Attorneys for Defendant William E. Baroni, Jr.*

Dated:  February 1, 2016