<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>WILLIAM E. BARONI, JR. and BRIDGET ANNE KELLY,<br><br>        Defendants. | Case: 2:15-cr-00193-SDW<br><br>**OPINION**<br><br>June 13, 2016 |

**WIGENTON**, District Judge.

Before this Court are Defendants William E. Baroni Jr. ("Baroni") and Bridget Anne Kelly's ("Kelly") (collectively, "Defendants") Motions to Dismiss the Indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B).[1]

For the reasons stated below, the Motions to Dismiss are **DENIED**.

I.     **BACKGROUND AND PROCEDURAL HISTORY**

This Court assumes familiarity with the allegations and procedural history of this case and reviews only the facts relevant to the present motion. On April 23, 2015, Baroni, former Deputy Executive Director of the Port Authority of New York and New Jersey ("Port Authority"), and

---

[1] As Defendants seek to join each other's motions, arguments made by one defendant are applied to both, unless otherwise noted. (Kelly Mot. at 40 (requesting permission "to join in the motions of her co-defendant to the extent they are not inconsistent with her filings"); Baroni Reply Br. at 26 (noting that he "joins in Ms. Kelly's pretrial motions").)

Kelly, former Deputy Chief of Staff for Legislative and Intergovernmental Affairs for the Office of the Governor of New Jersey ("OGNJ") were indicted by the United States Attorney's Office for the District of New Jersey ("USAO") on charges of conspiracy, fraud, and civil rights violations for their alleged roles in causing lane closures on the George Washington Bridge ("GWB") in September 2013. (Dkt. No. 1, Indictment.) The Indictment alleges that Defendants, along with David Wildstein ("Wildstein"), conspired to improperly close Local Access Lanes on the GWB to create traffic problems in order to punish the Mayor of Fort Lee, New Jersey, Mark Sokolich, for refusing to endorse Governor Chris Christie's re-election campaign. (*Id*. at 4-5.) To do so, the Indictment alleges that Defendants falsely claimed the reductions were part of a traffic study to justify using Port Authority personnel "to implement the changes to the Local Access Lanes" to hide "the true punitive purpose of the plan." (*Id*. at 5-8.) Personnel used included a manager who was tasked with implementing the lane changes, maintenance staff who altered signage for the changes, a traffic engineer, toll booth operators, the Port Authority Police Department, and employees of the Port Authority engineering department who collected and reviewed traffic data for the phony study. (*Id*. at 9-11.) Defendants communicated, in part, via email and text as they planned and implemented their scheme. (*See, e.g.*, *id*. at 8, 11, 12, 13, 15.)

The nine-count Indictment specifically charges Defendants as follows:

Count 1:    Conspiracy to Obtain by Fraud, Knowingly Convert, and Intentionally Misapply Property of an Organization Receiving Federal Benefits in violation of 18 U.S.C. § 666(a)(1)(A) and 18 U.S.C. § 371.

Count 2:    Obtaining by Fraud, Knowingly Converting, and Intentionally Misapplying Property of an Organization Receiving Federal Benefits in violation of 18 U.S.C. § 666(a)(1)(A) and § 2.

Count 3:      Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1349.

Counts 4-7:   Wire Fraud in violation of 18 U.S.C. § 1343 and § 2.[2]

Count 8:      Conspiracy Against Civil Rights in violation of 18 U.S.C. § 241.

Count 9:      Deprivation of Civil Rights in violation of 18 U.S.C. § 242 and § 2.

On February 1, 2016, Defendants moved to dismiss the Indictment. (Dkt. Nos. 71, 72.) The Government timely filed its opposition on March 11, 2016. (Dkt. No. 91.) Defendants filed their replies on April 13, 2016. (Dkt. Nos. 102, 103.) The Government requested and was granted permission to file a sur-reply. (Dkt. Nos. 105, 106, 107.) This Court held oral argument on the motions on April 28, 2016. (Dkt. No. 109.)

## II.    LEGAL STANDARD

Federal Rule of Criminal Procedure 12(b)(3)(B) permits a defendant to move to dismiss for "a defect in the indictment" including a "lack of specificity" or "failure to state an offense." FED. R. CRIM. P. 12(b)(3)(B); *see also United States v. Delle Donna*, 552 F. Supp. 2d 475, 482 (D.N.J. 2008) (noting that a defendant may "move to dismiss an indictment at any time for failure to state an offense"). An indictment must contain a "'plain, concise, and written statement of the essential facts constituting the offense charged' and include the statute(s) that the defendant(s) are alleged to have violated." *Della Donna*, 552 F. Supp. at 482 (quoting FED. R. CRIM. P. 7(c)(1)). "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or a conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974); *see also United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007). "[N]o greater specificity than the statutory language is required so long as there is sufficient factual

---

[2] Counts Four and Six are brought against Defendant Kelly and counts Five and Seven against Defendant Baroni.

3

orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989).

When reviewing a motion to dismiss pursuant to Rule 12(b)(3)(B), a trial court may only consider the allegations contained in the charging document, because "the indictment must be tested by its sufficiency to charge an offense" not by whether the "charges have been established by the evidence." *United States v. Sampson*, 371 U.S. 75, 78-79 (1962). An indictment "fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002), *abrogated on other grounds by Skilling v. United States*, 561 U.S. 358 (2010). "In evaluating a Rule 12 motion to dismiss, a district court must accept as true the factual allegations set forth in the indictment." *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012); *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir. 1990).

## III.   DISCUSSION

Before turning to Defendants' count-specific arguments, this Court must first address their contention that their Due Process rights have been violated because 1) they did not have fair notice that their conduct violated federal criminal law, and 2) the Government has not dealt with them in a "fundamentally fair manner." (Baroni Mot. at 1, 11-26; Kelly Mot. at 6-9.)

First, Defendants take the position that the laws under which they are charged are "impermissibly vague" pursuant to the "void-for-vagueness doctrine on an as-applied basis." (Kelly Mot. at 6.) A criminal statute is void for vagueness if it "'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute,' or is so indefinite that 'it encourages arbitrary and erratic arrests and convictions.'" *Colautti v. Franklin*, 439 U.S. 379, 390 (1979) (internal citations omitted); *United States v. Stevens*, 533 F.3d 218, 249 (3d Cir.

4

2008).  This doctrine "does not mean that [a] statute must define every factual situation that may arise."  *United States v. Nelson*, 712 F.3d 498, 508 (11th Cir. 2013).  Because this is an "as applied" challenge, it must be reviewed in light of Defendants' specific conduct and the underlying facts at hand.  Such an analysis is inappropriate for a pretrial motion to dismiss.  *See, e.g.*, *United States v. Mazurie*, 419 U.S. 544, 550 (1975) (holding it "well established that vagueness challenges to statutes which do not involve First Amendment freedoms" require review of the factual record); *Huet*, 665 F.3d at 595 (stating that "[a] pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence"); *see also United States v. Caputo*, 288 F. Supp. 2d 912, 917 (N.D. Ill. 2003) (stating that an "as applied" review requires analysis of the specific facts of a case and noting that those "types of factual determinations are not appropriately determined by a court in a pre-trial motion"); *United States v. O'Brien*, 994 F. Supp. 2d 167, 191 (D. Mass. 2014) (denying defendants' motion to dismiss the indictment in part for statutory vagueness and the rule of lenity, stating that "[t]o the extent that defendants raise issues that turn, even in part, on the evidence, those issues cannot properly be resolved on a motion to dismiss"). [3]  Therefore, Defendants' motion for dismissal of any of the counts of the Indictment under the void-for-vagueness as-applied doctrine is denied.

---

[3] In addition to their general vagueness argument, Defendants claim that the Indictment's "novel construction of § 666" deprives them of their "Due Process rights of 'fair notice' and protection from arbitrary enforcement of the law."  (Kelly Mot. 18-19; Baroni Mot. 28-31.)  Dismissal is not warranted, however, merely because the Government has chosen to prosecute a novel set of facts under § 666(a)(1)(A).  The statutory language of § 666(a)(1)(A) is broad, but not unclear.  *See, e.g.*, *Salinas v. United States*, 522 U.S. 52, 52 (1997) (describing the statute as having "plain and unambiguous meaning"); *United States v. Urlacher*, 979 F.2d 935 (2d Cir. 1992) (holding that "[t]he term 'intentionally misapply,' as it is used in § 666, is not unconstitutionally vague."); *United States v. Deen*, No. Cr. 14-184-01-03, 2016 WL 900463, at *3 (W.D. La. Mar. 7, 2016) (finding that "men of common intelligence are not required to guess at [the] meaning" of § 666(a)(1)(A)).

Nor is Defendants' invocation of the rule of lenity appropriate here.  The rule of lenity demands that courts interpret criminal statutes in favor of defendants only when there is a "grievous ambiguity or uncertainty" in the statute.  *United States v. Salahuddin*, 765 F.3d 329, 340 (3d Cir. 2014) (internal citation omitted).  Where, as here, a statute is not ambiguous, the rule of lenity is not applicable.

Defendants next claim that they have been denied Due Process because the Government "mishandle[ed]" *Brady* material and failed to demand complete document productions from the law firm of Gibson Dunn.  (Baroni Mot. at 1-2, 11-26.)  Defendants previously raised these arguments in Omnibus Discovery Motions filed in November 2015 and during oral argument before this Court on February 5, 2016.  (Dkt. Nos. 42, 43, 77.)  This Court addressed their concerns in its ruling from the bench and granted Defendants permission to issue a Rule 17(c) subpoena to Gibson Dunn for documents to which they believed they were entitled.   Aside from the Government's delay in turning over one set of materials, which the Defendants concede they have had in hand since January 11, 2016, (Baroni Mot. at 21-22, 21 n.8), Defendants point to no specific exculpatory documents that the Government has withheld.  This Court finds nothing unfair in the Government's dealings with Defendants as to document discovery or any other facet of this matter.  Defendants make much of the fact that they are private individuals involved in a case against the United States Government and adverse non-parties with significant resources, (Baroni Mot. at 13, 24), but this is not an uncommon state of affairs.  While rhetorically satisfying, labeling oneself a "David" to the Government's "Goliath" is insufficient to create a violation of Due Process.  Defendants' motion for dismissal of any of the counts of the Indictment on Due Process grounds is denied.

### A.  Counts One & Two

Counts One and Two charge conspiracy to violate and substantive violations of 18 U.S.C. § 666(a)(1)(A).  Section 666 provides in relevant part:

> **(a)** Whoever, if the circumstance described in subsection (b) of this section exists-
> **(1)** being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof--
> **(A)** embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other

> than the rightful owner or intentionally misapplies, property
> that--
>> **(i)** is valued at $5,000 or more, and
>> **(ii)** is owned by, or is under the care, custody, or
>> control of such organization, government, or agency;
>> . . .
> shall be fined under this title, imprisoned not more than 10 years, or
> both.

18 U.S.C. § 666(a)(1)(A).

The Indictment alleges that Defendants, together with Wildstein, conspired to and did fraudulently obtain, knowingly convert, and intentionally misapply Port Authority property worth at least $5,000.  (Indictment at 5, 28.)  Specifically, the Indictment alleges that Defendants concocted a sham traffic study in order to reduce Local Access Lanes on the GWB during morning rush hour without prior notice in order to cause significant traffic in Fort Lee to punish Mayor Sokolich.  (Indictment at 5-6.)  Defendants argue that the Indictment fails to allege facts that, as a matter of law, constitute violations of § 666.  (Kelly Mot. 27-34; Baroni Mot. at 3, 27-44.)

Courts interpreting federal criminal statutes "must pay close heed to language, legislative history, and purpose in order strictly to determine the scope" of forbidden conduct.  *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007).  Congress enacted § 666 "to redress particular deficiencies in identified existing statutes" and "to protect federal funds by authorizing federal prosecution of thefts and embezzlement from programs receiving substantial federal support even if the property involved no longer belonged to the federal government."  *United States v. Cicco*, 938 F.2d 441, 445 (3d Cir. 1991).  In so doing, Congress expanded the class of persons subject to prosecution to include individuals "authorized to act on behalf of another person or a government . . . includ[ing] a servant or employee, and a partner, director, officer, manager, and representative[.]"  *Vitillo*, 490 F.3d at 322.  In simple terms, § 666 "prohibits, *inter alia*, 'an agent' of a local government agency that receives more than $10,000 in federal funds from stealing from

that agency property valued at more than $5,000." *Id.* at 321.  Section 666 is "'extremely broad in scope,' as that statute seeks to ensure the integrity of vast quantities of federal funds previously unprotected due to a 'serious gap in the law.'" *Id.* (internal citations omitted); *see also Salinas v. United States*, 522 U.S. 52, 57 (1997) (noting that the enactment contains "expansive, unqualified language"); *United States v. Rooney*, 37 F.3d 847, 851 (2d Cir. 1994) (noting that "Congress intended the terms of the statute to be 'construed broadly'").  Its purpose is to "create new offenses to augment the ability of the United States to" prosecute the theft and misapplication of federal monies disbursed to non-federal organizations.  *Cicco*, 938 F.2d at 444.

To sufficiently assert a violation of § 666, the Indictment must allege:

- Defendants were agents of the Port Authority;

- The Port Authority received federal benefits of more than $10,000 in a one-year period;

- Defendants intentionally misapplied Port Authority property;

- The misapplied property was owned by or in the care, custody or control of the Port Authority; and

- The misapplied property was worth at least $5,000.

The first and second elements are not in dispute.  Defendants concede Baroni was an agent of the Port Authority for purposes of § 666, and Kelly acknowledges, although she was not an agent, that "Count 2 includes an aiding and abetting charge pursuant to 18 U.S.C. § 2."  (Kelly Mot. at 27 n.5.)  Nor do Defendants challenge that the Port Authority received more than $10,000 in federal benefits in the one-year period in question as required by 18 U.S.C. § 666(b), or that the property in question (employee compensation, access lanes, toll booths and losses from a interrupted traffic study) was owned by or in the care, custody or control of the Port Authority.

Therefore, Defendants' challenge to the Indictment's validity rests on whether it sufficiently alleges that they intentionally misapplied Port Authority property worth more than $5,000.

    1. Misapplication

Defendants argue that they did not misapply Port Authority property because they did not personally benefit from the lane closures.  (Kelly Mot. at 32 (asserting that "[i]nherent in the statute is criminalizing conduct in which an individual enriches himself or herself, or a family member or friend, with money or property from an agency receiving federal funds"); Baroni Mot. at 33-35.)  The statute, however, contains no such requirement.[4]  To misapply something is to make "improper or illegal use of funds or property lawfully held," BLACK'S LAW DICTIONARY (10th ed. 2014), or to "misuse or spend without proper authority," WEBSTER'S THIRD NEW INT'L DICTIONARY (unabridged 1993).  Misapplication can refer to any improper use of property, whether or not for personal gain, and can even encompass situations in which an organization benefits from the misuse.  *See United States v. Frazier*, 53 F.3d 1105 (10th Cir. 1995) (finding misappropriation of property under § 666(a)(1)(A) where an employee falsely certified that federal funds were used for training purposes, but instead used those funds to purchase computers for the organization); *see also* 3d Cir. Model Crim. Jury Instr. § 6.18.666A1A-3 (stating that misapplication "includes the wrongful use of the money or property for an unauthorized purpose, even if such use benefitted the (organization)").  Nor does the statute require that others be aware of the misuse before a violation occurs.  Thus, this Court is unpersuaded by Defendants' position that no misapplication occurred because Port Authority personnel were at all times engaged in their normal functions and the toll booths and lanes leading to them were still open and operational.

---

[4] Although the statute is captioned, "Theft or bribery concerning programs receiving Federal funds" and has been referred to as an "anti-bribery" rule, *United States v. Thompson*, 484 F.3d 877 (7th Cir. 2007), a caption alone does not define a statute's essential elements.

That speaks only to the Defendants' success in keeping their motives and goals hidden, not to the impropriety of those motives and goals. The Indictment clearly informs Defendants that they are being charged with misusing the Local Access Lanes, tollbooths and Port Authority personnel for retribution against Mayor Sokolich in violation of § 666.[5] This Court finds that the Indictment alleges facts sufficient as to the "misapplication" element.

2. Property

The Government identifies the relevant property as "compensation paid to [Port Authority] personnel in connection with the lane realignment,"[6] losses incurred from repeating a spoiled traffic study, and the value of the access lanes and toll booths. (Dkt. No. 45, Nov. 24, 2015 Gov't Opp'n Br. at 33; Indictment Ct. 1 ¶¶ 7, 15, 16, 21, 22, 24, 25, 40, 45-47, 51, 52.) Property is defined as the "rights in a valued resource such as land, chattel, or an intangible." BLACK'S LAW

---

[5] Defendants rely, in part, on the Seventh Circuit's decision in *United States v. Thompson*, 484 F.3d 877 (7th Cir. 2007), to argue that they cannot be found to have misapplied property unless they personally received money or property or "caused someone else to receive money or property." (Kelly Mot. at 33.) The *Thompson* decision, however, came after the defendant was tried and convicted, permitting the appellate court to review all the evidence, and also dealt with a situation in which the defendant bent procurement rules to award a travel contract to the lowest bidder in a competitive bidding process, as opposed to a bidder others on the selection group rated more highly. *Thompson*, 484 F.3d at 878. The Seventh Circuit found that, at worst, the evidence showed the defendant made a mistake in how she implemented procurement rules, which imposed no harm on the state as it received what it contracted for and at the market price. *Id.* at 881-82 (noting that "[a]s long as the state [got] what it contract[ed] for, at the market price, no funds have been misapplied, even if the state's rules should have led it to buy something more expensive (and perhaps of higher quality too)"). The facts as alleged in the Indictment here are quite different, and involve individuals allegedly determined to upend expected traffic patterns to get back at a political opponent. If true, the facts do not allege a mistake or a misunderstanding of policies or rules that resulted in a positive outcome, but rather an intentional desire to subvert existing policies and/or practices in order to achieve an improper end.

Similarly unhelpful to Defendants is *United States v. Jimenez*, 705 F.3d 1305 (11th Cir. 2013), (Baroni Mot. at 35), which like *Thompson*, did not find a defect in the charging document, but rather vacated the defendant's conviction based on a review of the sufficiency of the evidence, finding that defendant did not have any power over purchasing decisions and therefore, could not have misapplied property.

[6] The Government also argues that, in addition to "traffic engineers, toll collectors, police officers, [and] Media Relations employees," Defendants "themselves spent on-the-job time executing and concealing their fraudulent scheme while collecting salary and benefits from the Port Authority." (Gov't Opp'n Br. at 14 n.5.)

DICTIONARY (10th ed. 2014); *see also* 3d Cir. Model Crim. Jury Instr. § 6.18.666A1A-3 (defining property as "things of value" such as "money and tangible objects" but also "intangible things like the value of an employee's time and services").  The statute also contains a "safe harbor" provision that excludes from the definition of property "bona fide salary, wages, fees or other compensation paid, or expenses paid or reimbursed, in the usual course of business."  18 U.S.C. § 666(c). Defendants argue that the compensation, study losses, access lanes and toll booths are not "property" for purposes of § 666.  This Court disagrees.

First, although § 666(c)'s safe harbor provision protects bona fide compensation paid in the "usual course of business," it does not apply where employee services have been diverted to work that is not part of an organization's usual course of business.  *See, e.g.*, *United States v. Wecht*, No. Crim. 06-0026, 2006 WL 1835818, at *15 (W.D. Pa. June 29, 2006) (ruling that where a county coroner used county employees to perform work for his private medical practice a "theft of employee time" equated to a theft of property for the purposes of § 666); *United States v. Sanderson*, 966 F.2d 184, 186 (6th Cir. 1992) (affirming conviction where defendant used employees paid by the county for official work to work on defendant's private construction projects); *United States v. Pabey*, 664 F.3d 1084, 1089 (7th Cir. 2011) (affirming a § 666(a)(1)(A) embezzlement conviction where mayor used "on-the-clock city workers" to renovate a family home); *United States v. Delano*, 55 F.3d 720, 723-24 (2d Cir. 1995) (affirming conviction under § 666(a)(1)(A) of defendant who forced city parks department employees to "perform work outside the scope of their regular employment duties"); *United States v. Lawson*, No. Crim. 3:08-21-DCR, 2009 WL 1324157, at *2 (E.D. Ky. May 11, 2009) (concluding that "employee time is property within the meaning of this term in § 666(a)(1)(A) because this term includes both tangible and intangible property" and holding that "engineer estimates constitute 'property'" for the purposes

of § 666(a)(1)(A)).  Where, as here, the Indictment charges that Defendants diverted Port Authority personnel to do work that was not part of the agency's "usual course of business" to achieve their retributive goals, (Indictment at 6 ¶7, 8-9,  ¶¶ 15-16, 10-11 ¶¶ 21-23), the Indictment sufficiently alleges activity outside of the scope of § 666(c)'s protection.  In addition, this Court notes that whether the compensation at issue was "bona fide" or paid in the "usual course of business" is a question of fact for the jury.  *See, e.g.*, *United States v. Williams*, 507 F.3d 905, 909 (5th Cir. 2007) (noting that "[w]hether wages are bona fide and earned in the usual course of business is a question of fact for the jury to decide"); *United States v. Lupton*, 620 F.3d 790, 801-802 (7th Cir. 2010); *United States v. Dwyer*, 238 F. App'x 631, 647-48 (1st Cir. 2007).

Defendants present a similar argument as to the Indictment's allegations that because of Defendants' actions, the Port Authority incurred financial losses when it had to pay to repeat a traffic study ruined by the wrongful lane closures and the Port Authority had to repeat the study. (Indictment at 12 ¶ 25.)  Defendants take the position that a traffic study is not property, but rather a "service provided by an outside vendor."  (Kelly Mot. at 30-31.)  The Indictment does not allege, however, that the study itself is property.  Rather, the allegation is that the Port Authority was deprived of money when it was required to repeat the ruined study.  Defendants then argue that the traffic study "and any repeat thereof, were bona fide 'expenses paid or reimbursed' by the Port Authority for services that were actually rendered 'in the usual course of business.'"  (*Id.* (citing 18 U.S.C. § 666(c)).)   As noted above, any question of whether a repeat study was "bona fide" and paid in the "usual course of business" is a question of fact for the jury and not properly before this Court on a pretrial motion to dismiss.

Finally, The Indictment alleges that Defendants gained improper control over the access lanes and toll booths that handle GWB traffic by falsely claiming a lane reduction was necessary

to conduct a traffic study.  (Indictment at 6 ¶ 7, 11 ¶ 23, 19-20 ¶ 44.)  This Court can find no basis to limit property under § 666(a)(1)(A) to moveable property, such as traffic cones, as argued by Defendants.  (Kelly Mot. at 31-32.)  As such, the Indictment sufficiently and clearly identifies tangible property of value that the Government alleges was misused by the Defendants in violation of § 666(a)(1)(A).

### 3.  In Excess of $5,000

In order to "avoid prosecutions for minor kickbacks and limit violations to cases of outright corruption," indictments under § 666 may only be brought if the property in question is worth at least $5,000.  *United States v. Abbey*, 560 F.3d 513, 522 (6th Cir. 2009); *see also United States v. Briston*, 192 F. App'x 84, 86 (3d Cir. 2006) (stating that the $5,000 threshold is a jurisdictional requirement).  The Indictment charges that the value of compensation paid to Port Authority personnel, losses from a ruined traffic study, and the value of the lanes and toll booths satisfy this requirement.  (Indictment at 5 ¶ 2, 28 ¶ 2.)

Defendants again rely on § 666(c)'s safe harbor provision to argue that compensation cannot be considered when calculating the $5,000 threshold.  (Kelly Mot. at 28-30.)  However, because a determination of whether wages are "bona fide" and subject to the provision's protection is a question for the jury, this Court declines to rule on it now.  As for the remaining property, any value determinations are also properly reserved for the factfinder.  For purposes of the instant motion, the Indictment sufficiently alleges that the property in question is valued at no less than $5,000.

This Court holds that the Indictment is not defective as to Counts One and Two and Defendants' motions to dismiss as to those counts are denied.

### B.  Counts Three – Seven

Counts Three and Four of the Indictment allege that Defendants conspired with Wildstein to commit and did commit wire fraud in violation of 18 U.S.C. § 1349 and §§ 1343 and 2.  The substantive crime of wire fraud itself is defined in relevant part as:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

The elements of wire fraud are "(1) a scheme or artifice to defraud for the purpose of obtaining money or property, (2) participation by the defendant with specific intent to defraud, and (3) use of the mails or wire transmissions in furtherance of the scheme." *Nat'l Sec. Sys. v. Iola*, 700 F.3d 65, 105 (3d Cir. 2012); *see also United States v. Riley*, 621 F.3d 312, 329 (3d Cir. 2010); *United States v. Al Hedaithy*, 392 F.3d 580, 590 (3d Cir. 2004) (discussing the elements of mail fraud under 18 U.S.C. § 1341);[7] 3d Cir. Model Crim. Jury Instr. § 6.18.1343.  "Additionally, the object of the alleged scheme or artifice to defraud must be a traditionally recognized property right." *Al Hedaithy*, 392 F.3d at 590.

Defendants challenge the sufficiency of the Indictment on the grounds that 1) it fails to allege that Defendants schemed to defraud the Port Authority because Baroni and Wildstein had the authority to close the Local Access Lanes, and 2) Defendants did not obtain money or property. (Kelly Mot. at 36-37, 38-39; Baroni Mot. at 31.)

---

[7] Cases construing the elements of mail fraud are equally applicable to wire fraud cases.  *See Al Hedaithy*, 392 F.3d at 590 (establishing the elements to "prove mail or wire fraud"); *United States v. Giovengo*, 637 F.2d 941 (3d Cir. 1980).

Defendants attempt to argue that they could not have defrauded the Port Authority because Baroni and Wildstein had unfettered power and authority to change the configuration of the lanes at any time and for any purpose.  (Kelly Mot. at 36-37; Critchley Decl. Ex. B. at 155, 165, 170.)  The existence and scope of Wildstein and Baroni's authority, however, is again a question of fact for the jury.  At this juncture, this Court is limited to reviewing the sufficiency of the allegations contained in the Indictment, which charge that Defendants acted outside the scope of their authority in order to pursue goals that were unrelated to and at odds with the mission of the Port Authority.  (Indictment at 5 ¶ 2, 11 ¶ 23, 28 ¶ 2.)  Defendants may challenge those allegations at trial and show that Wildstein and Baroni were not defrauding their employer because they were acting within the bounds of the powers granted to them, but this Court cannot and should not make that factual determination at this juncture.

Defendants' second challenge to Counts Three through Seven, that they did not "obtain" money or property, is unavailing.  (Kelly Mot. 38-40.)  To obtain something generally means to "bring into one's own possession" or "to procure."  BLACK'S LAW DICTIONARY (10th Ed.)  For purposes of federal wire fraud charges, however, the term "obtain" does not require that a defendant possess or procure property, it only requires that "that which the victim was defrauded of is something that constitutes 'property' in the hands of the victim."  *Hedaithy*, 392 F.3d at 602.  Depriving an employer of control over an organization's assets is enough to satisfy this element.  *See, e.g.*, *United States v. Shyres*, 898 F.2d 647, 652 (8th Cir. 1990); *United States v. Fagan*, 821 F.2d 1002, 1009 (5th Cir. 1987); *United States v. Carlo*, 507 F.3d 799, 802 (2d Cir. 2007); *United States v. Gray*, 405 F.3d 227, 234 (4th Cir. 2005); *United States v. Welch*, 327 F.3d 1081, 1108 (10th Cir. 2003).  Defendants need not pocket money or drive a car off a dealer's lot or take office computer equipment home for personal use; it is enough that they prevented the Port Authority

from exercising "its right to exclusive use of" its property, which here allegedly includes toll booths and roadways, in addition to money in the form of employee compensation and the costs of redoing a traffic study.  (Indictment Ct. 1 ¶¶ 7, 15, 16, 21, 22, 24, 25, 40, 45-47, 51, 52.) Therefore, the Indictment adequately alleges violations of 18 U.S.C. §§ 1343 and 1349. Defendants' Motions to Dismiss Counts Three, Four, Five, Six and Seven are denied.

### C.   Counts Eight and Nine

Counts Eight and Nine charge Defendants with conspiring against civil rights, in violation of 18 U.S.C. § 241, and depriving residents of Fort Lee of their civil rights in violation of 18 U.S.C. §§ 242 and 2.  Section 242 prohibits persons acting "under color of any law, statute, ordinance, regulation, or custom" from "willfully subject[ing] any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States . . . ."  18 U.S.C. § 242. Defendants argue that Counts Eight and Nine must be dismissed because there is no constitutional right to "localized travel on public roadways," and even if such a right exists, it has not yet been "clearly established."  (Kelly Reply Br. at 15-18; Baroni Mot. at 47.)

It is true that the Supreme Court has not yet recognized a constitutional right to localized travel, *see, e.g.*, *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 275 (1993) (differentiating between interstate, which is constitutionally protected, and intrastate travel) and the federal appellate courts are split on the issue.  *See, e.g.*, *Cole v. Housing Auth. of the City of Newport, et al.*, 435 F.2d 807, 809 (1st Cir. 1970) (recognizing the right); *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir. 1971) (recognizing the right);  *Lutz v. City of York*, 899 F.2d 255, 268 (3d Cir. 1990) (recognizing the right); *Johnson v. City of Cincinnati*, 310 F.3d 484, 506-09 (6th Cir. 2002) (recognizing the right); *but see, e.g.*, *Eldridge v. Bouchard*, 645 F.

Supp. 749 (W.D. Va. 1986) *aff'd w.o. opinion*, 823 F.2d 596 (4th Cir. 1987) (rejecting the right); *Wright v. City of Jackson,* 506 F.2d 900, 903-04 (5th Cir. 1975) (rejecting the right); *Ahern v. Murphy*, 457 F.2d 363, 364-65 (7th Cir. 1972) (rejecting the right); *Townes v. City of St. Louis*, 949 F. Supp. 731 (E.D. Mo. 1996) *aff'd w.o. opinion* 112 F.3d 514 (8th Cir. 1997) (rejecting the right). In 1990, however, the Third Circuit, explicitly recognized the right to intrastate travel in its decision in *Lutz v. City of York,* 899 F.2d 255 (3d Cir. 1990). In *Lutz*, the Third Circuit held that a right to intrastate travel exists under even the narrowest conception of substantive due process and held that restrictions on that right are only permissible if they are narrowly tailored to meet significant government objectives. *Id.*, 899 F.2d at 268, 270 (upholding an anti-cruising ordinance imposed during the city's rush hour in order to eliminate traffic that, among other things, impeded emergency vehicles). In so doing, the Third Circuit concluded "that the right to move freely about one's neighborhood or town, even by automobile, is indeed 'implicit in the concept of ordered liberty' and 'deeply rooted in the Nation's history.'" *Id*. at 268.

A right is "clearly established," not when every possible factual scenario as to that right is identified, but rather when parties are on notice that their actions would be unconstitutional. *See, e.g.*, *Hope v. Pelzer*, 536 U.S. 730, 739-41 (2002) (stating that "officials can still be on notice that their conduct violates established law even in novel factual circumstances" and further noting that "binding . . . Circuit precedent" is such notice) (citing *United States v. Lanier*, 520 U.S. 259, 269 (1997)); *United States v. Cross*, 128 F.3d 145, 149 (3d Cir. 1997) (finding that so long as "the civil right allegedly violated is defined in the preexisting case law in a way that gave clear notice that the defendant's proposed conduct would abridge it, a prior conviction or analogous facts are not necessary"); *see also Townes v. City of New York*, 176 F.3d 138, 144 (2d Cir. 1999) (considering "whether a particular right was clearly established as of a particular time" by examining whether

the right had been "defined with reasonable clarity" and whether the Supreme Court or Circuit Court "had affirmed the existence of the right"); *Schneyder v. Smith*, 653 F.3d 313, 330 (3d Cir. 2011) (stating that in determining "whether a new scenario is sufficiently analogous to previously established law to warn an official that his/her conduct is unconstitutional," a court may look to "closely analogous case[s]" or to evidence "that the Defendant's conduct was so patently violative of the constitutional right that reasonable officials would know without guidance from a court"). *Lutz* made it clear that individuals have a right to intrastate travel, and that the right may only be curtailed by a significant government objective, narrowly tailored to achieve that goal. *Lutz*, 776 F.2d at 269; *see also Lanin v. Borough of Tenafly*, No. 12-2725 (KM)(MCA), 2014 Wl 31350, at *9 (D.N.J. Jan. 2, 2014) *aff'd*, 515 F. App'x 114 (3d Cir. 2013) (recognizing *Lutz* and the established right to intrastate travel "subject to reasonable regulation"). As such, public officials in this Circuit are on notice that they may only restrict the right of citizens to travel within a state for legitimate purposes.

The Government has not exceeded its authority in bringing charges against Defendants for violating that right. Here, the Indictment alleges that Defendants conspired to, and in fact did, disrupt traffic for Fort Lee residents on the GWB, impeding their right to travel inside the state of New Jersey free from arbitrary impediments. Defendants did so, the Indictment charges, not to achieve a legitimate and significant government interest, but rather to achieve an illegitimate political end – *i.e.* the punishment of Fort Lee's mayor for failing to support Governor Christie's re-election. (Indictment at 5.) A reasonable public official should have known that that conduct was "patently violative" of the constitutional right to intrastate travel recognized by the Third Circuit in *Lutz*. Political payback is not a significant government interest.[8] Taking those facts as

---

[8] Defendants argue that the right to intrastate travel articulated in *Lutz* does not create a "constitutional right to be free from improperly created traffic." (Kelly Reply Br. at 15.) The right articulated in *Lutz* is freedom to travel

true, as this Court must on a motion to dismiss the Indictment, this Court finds them sufficient to sustain the charges under 18 U.S.C. §§ 241, 242 and 2.  Defendants' motions to dismiss Counts Eight and Nine, therefore, are denied.

### D.  The Use of Baroni's Testimony and Document Production

In addition to the count-specific arguments made above, Baroni separately moves to dismiss the Indictment on the grounds that it was "obtained by improperly using immunized testimony" given to the Committee.  (Baroni Mot. at 5-10.)

On November 20, 2013, the New Jersey State Legislature, Assembly Transportation, Public Works and Independent Authorities Committee ("the Committee") sent Baroni a letter inviting him to testify before the Committee about the lane closures.  (Gov't Opp'n Br. Ex. 1.) The letter, signed by the Committee's Chairman, Assemblyman John Wisniewski, advised Baroni that failure to appear to testify on November 25, 2013 "will result in the issuance of subpoenas to require personal appearance to testify before the committee on this matter."  (*Id.*)[9]  Mr. Baroni, accompanied by counsel, voluntarily appeared on November 25th and testified about various matters relating to the lane closures.  (Gov't Opp'n Br. Ex. 2; Baroni Mot. at 5.)  He was not sworn in prior to his testimony.  (Gov't Opp'n Br. at 95-96; Baroni Mot. at 5.)  The Indictment refers to that testimony and alleges that Baroni "knowingly and intentionally made . . . misleading statements and false representations . . . ."  (Indictment at 23; Baroni Mot. at 6.)  The Indictment

---

within a state, subject to abridgement by a significant government interest narrowly tailored to achieve that goal. Where traffic is a byproduct of a significant government interest imposed in a limited fashion to meet that goal, it may be constitutional. *See, e.g.*, *Lanin*, 2014 WL 31350 at *9.  That is not what is alleged here, however.

[9] Identical letters were also sent to David Wildstein, Patrick Foye, and Michael Fedorko, Jr.  (Gov't Opp'n Br. Ex. 1.)

also identifies the allegedly false and misleading testimony as an overt act for the purposes of

Count One.  (Indictment at 27.)

> N.J.S.A. 52:13-3 provides in relevant part that:
>
> Witnesses summoned to appear before any committee authorized by this article or any other law to conduct an investigation or inquiry shall be entitled to receive the same fees and mileage as persons summoned to testify in the courts of the state. All such witnesses may be sworn by any member of the committee conducting the investigation or inquiry; and *all witnesses sworn* before any such *committee shall answer truly all questions put to them* which the committee shall decide to be proper and pertinent to the investigation or inquiry; and *any witness so sworn* who shall swear falsely shall be guilty of perjury. *No such witness* shall be excused from answering any such questions on the ground that to answer the same might or would incriminate him; *but no answers made by any witness to any such questions shall be used or admitted in evidence in any proceeding against such witness, except in a criminal prosecution against the witness for perjury in respect to his answers to such questions.*
> N.J.S.A. 52:13-3 (emphasis added).

The plain language of the statute grants immunity only to witnesses sworn prior to giving

testimony.  The statute first requires that "all witnesses sworn before any such committee" must

answer questions truthfully.  The next sentence refers back to that provision, noting that sworn

witnesses are not permitted to refuse to answer the questions posed to them to avoid self-

incrimination and providing that "no answers made by any witness to any such questions shall be

used or admitted in evidence in any proceeding against such witness . . . ."  Thus, the plain language

of the statute confers immunity only on those witnesses sworn to testify.  Here, because Baroni

was not under oath when he appeared before the Committee, his testimony is not immunized under

the statute and may be properly used by the Government. [10]

---

[10] Because this Court finds that Baroni was not under oath when he testified, it need not reach the issue of whether Baroni was "summoned" pursuant to the statute, although this Court notes that the phrase "summoned to appear" has been understood to mean "subpoenas for document production as well as to provide actual testimony." *N.J. Legislative Select Comm. on Investigation v. Kelly*, Nos. L-350-14, L-354-14, 2014 WL 1760028, at *33 (N.J. Super. L. Apr. 9, 2014).  Here, Baroni was not under subpoena when he appeared before the Committee and

After his testimony before the Committee, the New Jersey State Legislature Select Committee on Investigation ("SCI") served Baroni with subpoenas dated December 12, 2013, January 16, 2014, January 27, 2014, and February 10, 2014 compelling him to produce documents. (Gov't Opp'n Br. 95, Ex. 3; Baroni Reply Ex. 1.)[11]   Attached to each subpoena was a copy of N.J.S.A. 52:13-3 and related statutes.  (Gov't Opp'n Br. Ex. 3; Baroni Reply Ex. 1.)   The cover letters for each of Baroni's productions stated that they were made "pursuant to N.J.S.A. 52:13-3, *State v. Spindel*, 24 N.J. 395 (1957), *United States v. Hubbell*, 530 U.S. 27 (2000), and *United States v. Doe*, 465 U.S. 605 (1984)."  (Baroni Reply Br. Ex. 1 at E39, 41 43.)   In response to Baroni's document productions, Reid Schar, counsel for the SCI informed Baroni's counsel on February 25, 2014 that "Baroni's production of documents to the [SCI] in no way confers immunity on Mr. Baroni, including for any testimonial aspect of the production.  The [SCI] accepts the documents produced to date without any limitations or acceptance of the application of the authorities you cite" in those cover letters.  (Gov't Sur-Reply Ex. 1.)  On March 5, 2014, the USAO wrote to Baroni's counsel to set out the terms under which it would "accept Mr. Baroni's voluntary production to the government" of the materials Baroni had provided to the SCI.  (Gov't Sur-Reply Ex. 2.)  In that letter, the USAO stated that if Baroni were prosecuted "the government may use the Baroni documents without restriction against him in the government's case-in-chief at trial or

---

arguably was not "summoned" under the Statute. The fact that he could have been subpoenaed and was informed accordingly does not change the fact that he appeared voluntarily at the Committee's invitation.

[11] The December subpoena was addressed to Baroni as the Deputy Executive Director of the Port Authority, and the January subpoena was addressed to Baroni's attorneys at the Law Office of Lowenstein Sandler.  (Gov't Opp'n Br. Ex. 3; Baroni Reply Ex. 1.)

In January 2015, the United States Attorney's Office for the District of New Jersey ("USAO") subpoenaed the New Jersey Legislature for "any and all records obtained . . . by the Committee in connection with its inquiry and investigation of the reduction of access lanes for the Borough of Fort Lee to the George Washington Bridge" and recordings of Baroni's November 25th testimony. (Baroni Reply at 10.)

for purposes of sentencing" but would not use the "act of producing" the documents against him. (*Id.*)  Baroni's counsel accepted those terms on March 7, 2014.  (*Id.*)  Baroni now requests a hearing pursuant to the Supreme Court's decision in *Kastigar v. United States*, 406 U.S. 441 (1972), on the issue of whether the Government improperly used documents he produced to the SCI, arguing that he produced documents "pursuant to state-law immunity."  (Baroni Reply at 8-12.)

In *Kastigar*, the Supreme Court sought to protect against the improper use of immunized testimony and held that "[o]nce a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence."  *Kastigar*, 406 U.S. at 460 (internal citation omitted).  As discussed above, Baroni did not testify before the Committee under state immunity pursuant to N.J.S.A. 52:13-3.  Nor were his productions to the SCI immunized.  In addition, counsel for the SCI explicitly informed Baroni's counsel that his production "in no way confer[red] immunity on" him.[12]  (Gov't Sur-Reply Ex. 1.)   Further, the Government explicitly reserved its right to use the documents against Baroni "without restriction."  (Gov't Sur-Reply Ex. 2.)  Therefore, this Court sees no grounds upon which Baroni can claim that those document productions were immunized or that the Government was precluded from using them either to craft the Indictment or to prosecute.  Baroni's motion to dismiss the Indictment based on the Government's use of his testimony before the Committee or his document production to the SCI is denied.

## IV.    CONCLUSION

---

[12] Baroni argues that because those documents were produced in response to a subpoena, they should fall under the immunity provision of N.J.S.A. 52:13-3.  However, as discussed above, the statutory immunity provided for only attaches to testimony that is both summoned (subpoenaed) and sworn.  Because Baroni's testimony was never sworn, he has no basis upon which to claim immunity.

For the reasons set forth above, Defendants' Motions to Dismiss the Indictment and for a

*Kastigar* hearing are **DENIED**.  An appropriate order follows.

_____/s/ Susan D. Wigenton_____

SUSAN D. WIGENTON, U.S.D.J

Orig:          Clerk
cc:            Parties